437 F.Supp. 344 (1977)
UNITED STATES of America on Behalf of its Agency, SMALL BUSINESS ADMINISTRATION
v.
Laurant D. GORE, Individually and t/a Dondee Shoes, and Gloria C. Gore, former wife, a/k/a Gloria Wood.
No. 76-622.
United States District Court, E. D. Pennsylvania.
August 1, 1977.
*345 David W. Marston, U. S. Atty., Philadelphia, Pa., H. Clark Connor, III, Asst. U. S. Atty., for plaintiff.
David E. Shapiro, Philadelphia, Pa., for defendant.

MEMORANDUM AND ORDER
BRODERICK, District Judge.
This action[1] for the collection of a loan made by the Government on behalf of its agency, the Small Business Administration, is before the Court pursuant to 28 U.S.C. § 1345.[2] Having heard testimony from plaintiff's witness and from the defendant during a trial before the Court without a jury, the Court will enter judgment for the plaintiff ("SBA") and against the defendant, Laurant D. Gore.
The parties have stipulated to many of the facts involved in this litigation. On July 24, 1968, SBA entered into a contract with defendant and his wife whereby SBA loaned them $25,000 to enable the Gores to start a retail shoe business, Dondee Shoes, in which the defendant was the sole proprietor. The loan was to be repaid in monthly installments of $272.00, with the last installment due on or before July 24, 1978. Also on July 24, 1968, the Government and the defendant entered into a security agreement covering all machinery, equipment, inventory and after acquired items.
*346 In February, 1970, SBA guaranteed a loan for defendant to enable him and a Mr. Garnet to open El-Gee Shoes, also a retail shoe establishment, located about one block away from Dondee Shoes. El-Gee Shoes, a corporation in which defendant owns 85% of the stock, has been successful and its loan was paid in full on September 8, 1975. Defendant is presently Manager and Treasurer of El-Gee Shoes.
After the opening of El-Gee Shoes in February, 1970, defendant began to experience financial difficulties with Dondee Shoes. Gore requested management assistance from the SBA. In response to this request, SBA arranged for a member of SCORE[3] to visit defendant and to provide defendant with managerial assistance.[4] In addition, on August 31, 1970, SBA engaged the consulting firm of Dimpex Associates to evaluate the viability of Dondee Shoes and make recommendations to improve the profitability of the business.
Dimpex prepared a report detailing its recommendations, copies of which were received by SBA and defendant.[5] Throughout this period in which the defendant requested managerial assistance, SBA sought financial statements from Dondee Shoes so that it could properly evaluate the condition of the business. Defendant never supplied SBA with these statements, thus impeding the agency's efforts to aid him.
Defendant made payments on the loan to Dondee Shoes until April, 1971. In July, 1971, defendant requested a moratorium on payments on the loan to Dondee Shoes. Since SBA requires financial statements before it will grant a moratorium, and defendant had not supplied these, his request was denied.
In February, 1972, SBA placed the loan to Dondee Shoes in liquidation status. Prior to the liquidation sale of April 6, 1972, SBA sent notice to debtors of record that it had the first lien. The sale was advertised in the Philadelphia Inquirer on March 25, April 1, and April 6, 1972. There were also 400 direct mailings to trade persons by way of proofs from the Philadelphia Inquirer.
On April 6, 1972, pursuant to the terms of the security agreement of 1968, a liquidation sale at public auction was conducted by Samuel Flickstein Auction Company on the Dondee Shoe premises. At the time of the sale, Mr. Flickstein rejected a bulk bid of $1500.00, feeling this bid to be low and sold the items on a lot basis, receiving bids totaling almost $1900.00. After deducting the costs of the sale and commission, the net proceeds totaled $959.44, which was applied to the outstanding balance of defendant's loan. Defendant, having received notice, attended the April 6, 1972 sale.
Three years later, on August 22, 1975, SBA, by certified letter, notified defendant that due to the default, the entire balance of the loan, plus interest, was due and immediate payment was demanded. Defendant acknowledged receipt of this letter.
While not disputing that he was in default,[6] defendant contends that he was justified in discontinuing repayment of the loan because SBA breached its agreement *347 with him by refusing to provide defendant with managerial assistance.
Defendant contends that Clause 7 of the Affirmative Covenants of the July 24, 1968 loan agreement, which states that the Gores "Agree to accept management training as required by the SBA" imposed a duty on the SBA to furnish such assistance. On its face, the agreement requires that the defendant accept management training if the SBA determines such training to be necessary. In no way did the SBA covenant to provide management assistance even in the event that the borrower requested such aid. Nonetheless, when defendant requested managerial assistance in 1970, the SBA arranged for a representative of SCORE to render such assistance and later engaged the services of Dimpex Associates to make recommendations. Thus, the Court concludes that although the SBA was not legally obligated to provide defendant with managerial assistance, it nevertheless did so. Defendant, therefore, was not justified in defaulting on the loan.
Defendant next contends that the SBA's public sale of defendant's inventory violated the law in that (1) the sale of the inventory did not realize a large enough amount of money, and (2) the liquidation sale was a bulk transfer governed by 12A P.S. §§ 6-101 et seq. and was in violation of 12A P.S. § 6-108 in that the SBA failed to obtain a list of defendant's other creditors and to provide each with notice of the sale.
In considering defendant's objection to the amount of proceeds realized from the sale, the Court looks to the Uniform Commercial Code as adopted by Pennsylvania, 12A P.S. § 9-507(2) which provides:[7]
The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. The principals stated in the two preceding sentences with respect to sales also apply as may be appropriate to other types of disposition.
The test under the Uniform Commercial Code is that of commercial reasonableness. Disposition of collateral after default is controlled by 12A P.S. § 9-504 which provides in pertinent part:
(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation of processing. Any sale of goods is subject to the Article on Sales (Article 2). The proceeds of disposition shall be applied in the order following to
(a) the reasonable expenses of retaking, holding, preparing for sale, selling and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses incurred by the secured party;
(b) the satisfaction of indebtedness secured by the security interest under which the disposition is made;
. . . . .
(2) If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and unless otherwise agreed, the debtor is liable for any deficiency....
(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the *348 disposition including the method, manner, time, place and terms must be commercially reasonable. . . . [R]easonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, and except in the case of consumer goods to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or who is known by the secured party to have a security interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale.
The Court concludes that the advertising of the sale in the Philadelphia Inquirer on three different occasions, the direct mailings to trade persons, the notification of the sale to defendant, as well as the manner in which the sale was conducted, more than fulfill the requirements of 12A P.S. § 9-504. SBA also acted within the law by deducting costs and then applying the proceeds of the sale to satisfy defendant's indebtedness as required by 12A P.S. § 9-504(1)(a) and (b).
Defendant offers no support for the proposition that the liquidation sale is governed by 12A P.S. §§ 6-101 et seq. It appears to the Court that it is not.
12A P.S. § 6-103, entitled "Transfers Excepted From is Article", provides in pertinent part:
The following transfers are not subject to this Article:
. . . . .
(3) Transfers in settlement or realization of a lien or other security interests;
12A P.S. § 6-103(3) has been interpreted by at least one Pennsylvania court as excluding liquidation sales of inventory from the provisions of 12A P.S. §§ 6-101 et seq.:
If the sale was in liquidation of a security interest, it would be exempt from the scope of the bulk sales provisions of the code, 12A P.S. § 6-103(3).
Uhr v. 3361, Inc., 21 D. & C.2d 348, 349 (Court of Common Pleas, Phila. 1960).
The Court concludes that the law of secured transactions, 12A P.S. §§ 9-101 et seq., controls the questioned transaction. As we have heretofore pointed out, the SBA fully complied with the requirements of 12A P.S. §§ 9-101 et seq. in selling the items in a commercially reasonable manner.
This memorandum and order is in lieu of findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.
Accordingly, the Court finds that the Government has proven by a preponderance of the evidence that the defendant is indebted to it in the amount of $19,619.46 as principal balance; accrued interest of $4,845.19 as of June 30, 1977; and daily interest accrued of $2.997 from June 30, 1977 to the day of judgment.
NOTES
[1] On July 14, 1977, this Court entered a judgment of default against Gloria C. Gore, a/k/a Gloria Wood, pursuant to Fed.R.Civ.P. 55.
[2] 28 U.S.C. § 1345 provides:

[T]he district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.
[3] SCORE is the acronym for Service Core of Retired Executives. SCORE's members are retired business persons who do management and consulting work.
[4] Defendant testified that the SCORE representative, a retired automobile salesman, was unfamiliar with the retail shoe business and was unable to provide any managerial assistance.
[5] In reviewing the Dimpex Report, we note the following at page 5 of the Report:

Some of these categories of customers are also served by Elgee Shoes in which Mr. Gore shares joint ownership. This store is located at 139 South 52nd Street.
There has been a marked dimunition of sales for DONDEE SHOES since the opening of the above-mentioned store in February 1970. In 1968, DONDEE SHOES averaged approximately $1,000 to $1,300 per week in sales and this increased in 1969 to an average weekly sales of $1,100 to $1,400. However, since February sales have decreased drastically to an average of between $700 and $900.
[6] Testimony was given at trial that as of June 30, 1977, the principal balance on the loan was $19,619.46; accrued interest was $4,845.19 and the daily interest accrual is $2.997.
[7] In the security agreement entered into by the parties, specific reference is made to the applicability of the Uniform Commercial Code.