**In re Louis V. AUER, Debtor.**

**Louis V. AUER, Plaintiff,**

v.

**EQUIBANK, Defendant.**

**Bankruptcy No. 88–3510.**
**Adv. No. 89–0075.**

United States Bankruptcy Court,
W.D. Pennsylvania.

Aug. 25, 1989.

---

**8.** We note that the interplay between sections 105(a) and 706(b) authorize conversion to a

Chapter 11 by the court.

K. Lawrence Kemp, Kemp & Kemp, New Kensington, Pa., for plaintiff/debtor.

Peter N. Pross, Kincaid & McGrath, P.C., Pittsburgh, Pa., for defendant/Equibank.

Robert H. Slone, Mahady & Mahady, Greensburg, Pa., Chapter 7 trustee.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court is Plaintiff's *Complaint To Determine Secured Status*, which seeks to reduce the extent of Defendant Equibank's ("Equibank") security interest in his residential property.

Debtor contends that the sale by Equibank of inventory and equipment belonging to Swyzz Manufacturing & Machine Co. ("Swyzz"), a company wherein Debtor was the principal, subsequent to a default by Swyzz and Debtor on a promissory note, was not conducted in a commercially reasonable manner. As a result, Debtor contends that the extent of Equibank's security interest in his residence should be reduced by the difference between the sum actually netted at the sale and the sum that should have been netted.

Equibank asserts that the sale was conducted in a commercially reasonable manner, and that no diminution in its security is appropriate.

The Court has heard all of the testimony presented at trial, including a reading of

the deposition of Maurice Auer, reviewed all of the exhibits, and researched the applicable law, and herein determines that the sale by Equibank was in fact conducted in a commercially reasonable manner. As a result of this determination, it will not be necessary to consider whether this Court has authority to grant the relief sought by Debtor.

## FACTS

On October 31, 1984, Debtor and Swyzz executed and delivered to Equibank a promissory note in the amount of $87,-000.00. That same day, Swyzz granted Equibank a security interest (which subsequently was duly perfected) in all of its present and future inventory and equipment. Concurrently, Debtor granted Equibank a mortgage on his personal residence as security for the loan.

Swyzz and Debtor ultimately defaulted. As of August 11, 1989, a total of $80,524.70 in principal and interest was due and owing, with additional interest accruing at the rate of $19.19 per day.

Swyzz filed a voluntary Chapter 11 petition in this Court on September 9, 1987. Just prior to hearing on Equibank's Motion To Convert Debtor to Chapter 7, Swyzz orally motioned its case be dismissed, averring no further need for bankruptcy court protection. Said Motion To Dismiss was granted based upon counsel's representation.

On March 2, 1988, Equibank sent to Debtor notice of its intention to foreclose on the mortgage unless Debtor cured the default within thirty (30) days.

In April of 1988, Equibank retained F. H. Fall Liquidations ("Fall") to examine the equipment and inventory located at Swyzz's place of business. Debtor was given an opportunity to cure the default; and in addition, Debtor was given an opportunity to sell the equipment and inventory himself. Debtor failed and/or refused to cure the default and refused to expend his time or energies in selling the equipment unless he was paid a commission. Equibank declined payment of a commission to

Plaintiff and determined to pursue the auction sale in question.

Debtor was notified on April 27, 1988, that Equibank had retained Fall to liquidate Swyzz's equipment and inventory. He was formally notified on May 9, 1988, that Swyzz's equipment and inventory would be sold by Fall, at either a private or a public auction sale. Finally, Debtor was notified on June 9, 1988 that a public auction was to take place at Swyzz's place of business on June 25, 1988 at 10:00 a.m. Thereafter, Fall placed advertisements of the auction in the *Pittsburgh Press* on June 12, 1988 and June 19, 1988, and mailed announcements to seventy-seven (77) potential buyers.

Prior to the auction, Fall inspected the equipment and inventory and invited approximately twenty-five (25) potential buyers to examine the equipment and submit bids. Only six (6) of those who were invited actually inspected the equipment. The only interest expressed was a bid for $3,000.00 for the entire lot.

Approximately twenty-five (25) individuals attended the auction. They were given an opportunity to inspect the items immediately prior to auction.

The auction began at the scheduled time and lasted less than ten (10) minutes. It was conducted without the benefit of electricity, which had been turned off by the power company in the preceding weeks because Debtor refused and/or neglected to pay the bill. Neither Debtor nor any member of his family attended the auction. The equipment and inventory were offered for sale only in bulk and not on a piece-by-piece basis. Mr. Dennis Teich, a disinterested third party and principal of Ford City Equipment Company, purchased the entire lot for $8,000.00. Shortly thereafter, he sold basically everything to Mr. Louis Auer, III, son of the Debtor, for $10,000.00.

After deducting the expenses of the sale, including Fall's ten percent (10%) commission, the net proceeds amounted to $6,710.56.

Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code on December 30, 1988.

## ANALYSIS

■ A secured party, after default by a borrower, may take possession of collateral and may sell or otherwise dispose of any or all of it in its then condition or following any commercially reasonable preparation or processing. 13 Pa.C.S.A. §§ 9503(a) and 9504(a).

■ The collateral may be sold either as a unit or in parcels and at any time and place and on any terms. Every aspect of the disposition, however, including the method, manner, time, place, and terms, must be commercially reasonable. 13 Pa. C.S.A. § 9504(c).

■ The fact that a better price could have been obtained by a sale at a later time or in a different manner from that selected by the secured party is not of itself sufficient to establish that the sale was not conducted in a commercially reasonable manner. 13 Pa.C.S.A. § 9507(b).

■ Sale of the collateral in accordance with these provisions of the Uniform Commercial Code is "commercially reasonable" if the seller acts in good faith, avoids loss, and makes effective realization. *See Old Colony Trust Co. v. Penrose Industries Corp.*, 280 F.Supp. 698, 715 (E.D.Pa.), *aff'd* 398 F.2d 310 (3rd Cir.1968) (applying Massachusetts law).

Debtor contends that the sale was commercially unreasonable in that:

(1) the equipment and inventory were sold in bulk rather than on a piece-by-piece basis; and

(2) the building in which the auction was conducted was dark and unlit.

These contentions will be addressed *ad seriatim*. The deposition of Maurice Auer, son of Debtor, herein has been reviewed and considered. Little weight has been given to this evidence.

■ 1. Equibank's decision to sell in bulk, rather than on a piece-by-piece basis, was commercially reasonable in light of the specific circumstances of this case.

Approximately one (1) month prior to the auction, twenty (20) to twenty-five (25) potential buyers were invited by Fall to inspect the equipment on site and to make bids. No decision had been made at that time concerning whether to sell in bulk or on a piece-by-piece basis. Of the six (6) potential buyers who inspected the equipment and inventory, only one (1) made any bid at all. He bid $3,000.00 for the entire lot. The others did not bid and expressed no interest to do so.

In addition, the equipment was not very marketable in light of its condition. Many of the larger pieces were in serious disrepair and/or obsolete. Others were partially disassembled and lacked parts needed to make them operable. All were poorly maintained, unclean, and not particularly desirable.

Equibank took these factors into consideration and concluded that the net return would be less on a piece-by-piece basis than if the machinery were sold in bulk, "as is, where is".

Mr. Dennis Teich, who purchased the machinery at the auction for $8,000.00, was one of the six (6) prospective buyers who had come at Fall's invitation to inspect the machinery and to bid on it some time prior to the auction. Teich did not bid on it at that time because the equipment was in poor condition and he felt that he could not make a profit reselling it. He testified that nobody who attended the auction requested that any of the items be sold separately and stated that he would not have attended the auction had it been conducted on a piece-by-piece basis. Apparently the time utilized in this piecemeal process could not be justified based upon his anticipated sales and profits.

Finally, it is worth noting that, since Fall's fee was based on a percentage of the sale price at the auction, it was in Fall's best interest to sell the machinery in a manner which would command the highest price. It would strain credulity to conclude that Fall, an experienced auctioneer, would recommend a bulk sale if selling them piecemeal would have realized a greater return.

■ 2. The contention of Debtor that the equipment was exhibited and sold in a

dark building is factually incorrect. Even though the electricity had been turned off at some time prior to the auction, the building was illuminated by natural light which was adequate to enable potential buyers to inspect the machinery.

The sale was conducted in an industrial building owned by Debtor and/or Swyzz at 10:00 a.m. on a clear, bright day in late June. The front wall of the building, where most of the machinery was kept, was basically glass. Also, there were opaque plastic panels on the ceiling approximately twenty-five (25) feet overhead.

No complaints were voiced at the auction concerning the lack of electricity. Although flashlights were made available in case a potential buyer needed more light in order to inspect the inner workings of the machinery, no one requested one.

Mr. Teich, the purchaser of the equipment and inventory at the auction, stated that he had no trouble seeing the machinery. He did not hear anyone else complain about the lack of adequate lighting. Finally, he testified that it is not uncommon for auctions to be conducted without electricity.

The decision of Equibank not to have the electricity turned on again was commercially reasonable. In fact, any decision on its part to have it turned on well might have been commercially *un* reasonable. Equibank decided that it probably would have been too costly to do so because past due amounts would have to be paid. Such an expenditure, it was decided, would not have been cost-efficient as it would have further diminished the net return.

### CONCLUSION

As has been indicated, Debtor maintains that, because the auction was conducted in a commercially unreasonable manner, Equibank's secured status must be reduced by an amount equal to what the machinery would have sold for had it been sold in a commercially reasonable manner. It is not clear that Debtor would be entitled under the Bankruptcy Code to the relief he seeks, even if he were correct in claiming that the auction was commercially unreasonable.

Indeed, Debtor admitted at trial that he is unaware of any case law in support of his position. It is not necessary, however, for the Court to address this matter in light of the determination that the auction was conducted in a commercially reasonable manner.

An appropriate Order will be issued.