CHRYSLER CREDIT CORPORATION

v.

B.J.M., Jr., INC., Justin Gambone, Carol J. Gambone and Joseph A. Lashinger.

B.J.M., Jr., INC., Justin Gambone, Carol J. Gambone and Joseph A. Lashinger

v.

CHRYSLER CREDIT CORPORATION, George Tallant and Edward Muscara.

Civ. A. No. 91–CV–6996.

United States District Court, E.D. Pennsylvania.

Oct. 14, 1993.

Peter S. Bejsiuk, Kevin L. Flanagan, John C. Penberthy, III, Capehart & Scatchard, P.A., Mount Laurel, NJ, for Chrysler Credit Corp., George Tallant and Edward Muscara.

Nicholas M. De Vito, Nicholas M. De Vito & Associates, Cleveland, OH, Joseph A. Lashinger, Jr., Fox, Differ, Callahan, Sheridan, O'Neill & Lashinger, Norristown, PA, Peter C. Paul, Tina L. Nugent, W.J. Winterstein, Jr., Rawle & Henderson, Philadelphia, PA, Stanley Morganstern and Christopher M. De Vito, Nicholas M. De Vito & Associates, Cleveland, OH, for B.J.M., Jr., Inc., Justin Gambone, Carol J. Gambone and Joseph A. Lashinger.

## DECISION

JOYNER, District Judge.

This consolidated civil action involving claims for debts arising out of a security agreement and master credit arrangement and counterclaims for bad faith, lender liability and negligence was tried before this Court without a jury between June 3 and June 9, 1993. The parties thereafter submitted their proposed findings of fact and conclusions of law in July, 1993 and the matter is now ripe for adjudication. Accordingly, pursuant to Fed.R.Civ.P. 52(a), this Court now renders the following:

## FINDINGS OF FACT

1. Chrysler Credit Corporation is a Delaware corporation with offices located at 901 Wilshire Drive, Troy, Michigan and 200 Tournement Drive, Horsham, Pennsylvania and is engaged in the business of providing wholesale financing for the acquisition of new and used motor vehicle inventory for motor vehicle dealerships. It is a subsidiary of the Chrysler Financial Corporation which is, in turn, a subsidiary of Chrysler Corporation. (N.T. 6/3/93, 47–48; 6/04/93, 4; Exhibits P–13, P–21)

2. B.J.M., Jr., Inc. is a Pennsylvania corporation which had, at all relevant times, a principal place of business at 2431 West Main Street, Norristown, Pennsylvania and was engaged in the business of selling new and used Jeep/Eagle and other motor vehicles to the general public under the name "All–Star Jeep/Eagle." (Exhibits P–13, P–27)

3. Joseph Lashinger is an adult individual residing at 129 Stable Road, Norristown, Pennsylvania. (N.T. 6/7/93, 92)

4. Justin and Carol Gambone are adult individuals, husband and wife, who reside at 2130 Wentz Church Road, Lansdale, Pennsylvania. (N.T. 6/8/93, 212)

5. Prior to 1989, one-hundred percent (100%) of the stock of B.J.M., Jr., Inc. was owned by one Benjamin J. Marchese, Jr. (N.T. 6/7/93, 98–100)

6. In October, 1989, Joseph Lashinger and Justin and Carol Gambone purchased 66% of the stock of B.J.M., Jr., Inc. for $850,000 from Mr. Marchese. One of the provisions of that buy-sell agreement and one of the conditions for Chrysler Credit's approval of the agreement was the understanding that the Lashingers and the Gambones would satisfy for B.J.M., Jr., Inc. a Meridian Bank loan, a Fidelity Bank auto lease and the approximately $209,000 sold-out-of-trust situation which the corporation then had with Chrysler Credit Corporation. (N.T. 6/3/93, 7–8; 6/7/93, 108–110; 6/9/93, 50–51)

7. George Tallant and Edward Muscara are adult individuals who were at all times relevant hereto employed by Chrysler Credit Corporation as Branch Manager and Sales

Representative respectively. (N.T. 6/3/93, 4–6; 6/4/93, 91–92)

8. Under the Security Agreement and Master Credit Agreements which Chrysler Credit and B.J.M., Jr., Inc. entered into in May, 1988 and again in May, 1991, interest would begin to accrue upon delivery of each financed vehicle to the dealership and would continue to accrue until such time as the vehicle was paid for in full by the dealership after sale. (N.T. 6/3/93, 67; Exhibit P–13)

9. In May, 1988, prior to Messrs. Lashinger and Gambone's acquisition of an interest in the corporation, B.J.M., Jr., Inc., through its then-principal, B.J. Marchese, Jr. and in conjunction with the execution of a Security and Master Credit Agreement, gave to Chrysler Credit a security interest in all of its "chattel paper, accounts whether or not earned by performance, contract rights, documents, instruments, general intangibles, consumer goods, equipment, fixtures, leasehold improvements, whether now owned or hereafter acquired, together with all additions and accessions thereto," all "inventory, including but not limited to all new and used motor vehicles, campers, travel trailers, mobile homes and motor homes and automotive parts and accessories, whether now owned or hereafter acquired, together with all additions and accessions thereto" and "all proceeds of the property covered by this statement ...." This security interest, in turn, was documented by the filing of financing statements with both the Pennsylvania Department of State and the Office of the Prothonotary of Montgomery County, Pennsylvania on June 3, 1988. (N.T. 6/03/93, 5–7; Exhibits P–2, P–3, and P–4)

10. The Master Credit Agreement and Security Agreement entered into by B.J.M., Jr., Inc. and Chrysler Credit Corporation in May, 1988 was lost and could not be located in Chrysler Credit's files. That agreement, however, had the same terms and conditions as did the Master Credit Agreement and Security Agreement which the parties executed in May, 1991. (N.T. 6/03/93, 12–13; Exhibit P–10)

11. A sold-out-of-trust situation arises when an automotive dealership sells and receives payment for a vehicle which they have financed but fails to remit payment for that vehicle to the wholesale (or retail) credit source. (N.T. 6/3/93, 8–9)

12. After the November, 1989 buy-out, Justin Gambone assumed the position of President and general manager of B.J.M., Jr., Inc., trading as All–Star Jeep/Eagle. Joseph Lashinger became the Vice President of the corporation. (N.T. 6/8/93, 218; Exhibit P–5)

13. In November, 1989 and again in November, 1990, B.J.M., Jr., Inc., on these occasions through its principals Lashinger and Gambone, gave security interests to Madison Bank in "all of the debtor's property and assets whether existing or hereafter acquired or created, including all of ... [B.J.M.'s] chattel paper, fixtures, accounts, instruments, money, inventories, equipment and all accessories, substitutions and appurtenances thereto, documents, general intangibles, records, insurance policies and all cash and non-cash collateral and the proceeds and products of the foregoing ...." to secure loans in the amounts of $250,000 and $100,000, respectively. On November 16, 1990, that security interest was recorded and filed in the office of the Prothonotary of Montgomery County, Pennsylvania. (N.T. 6/03/93, 86–91; 6/04/93, 71–78; Exhibit P–39)

14. Justin Gambone holds a Bachelor's degree in Business Administration from Temple University and has partially completed graduate work at Temple toward an advanced business degree. Since his graduation from college in 1974, Mr. Gambone has been employed primarily in the automotive sales industry in the capacity of accountant, office manager, controller and general manager and for a time was also self-employed as a tax preparer/accountant and small business planner. From 1978 to 1989, he was employed as the general manager of Marchese Honda. (N.T. 6/8/93, 212–217; Exhibit D–54)

15. Joseph Lashinger earned both a Bachelor's degree in Political Science and a Master's degree in American National Government from the University of Pennsylvania and has a law degree from the Delaware (Widener) Law School. He is a partner in

the Norristown, Pennsylvania law firm of Fox, Differ, Callahan, O'Neill & Lashinger specializing in family law and was an adjunct professor of family law at Widener Law School for four years. Mr. Lashinger is also a contributing editor to the Pennsylvania Family Lawyer, a former member of the Pennsylvania House of Representatives and a partner in a Harrisburg-area lobbying firm. In addition, Mr. Lashinger had in the past represented the legal interests of Mr. Marchese and other automotive dealerships in Montgomery County; he is a former director of the Madison Bank in Blue Bell, Pennsylvania, a former restaurant owner and had done tax consulting work in the late 1970's–mid 1980's. (N.T. 6/7/93, 92–97)

16. Prior to creating and executing the November, 1989 buy-sell agreement, Messrs. Lashinger and Gambone did some due diligence and, together with one of Mr. Lashinger's law partners examined the dealership's and the corporation's debt structure, operations and expenses and spoke with Chrysler Motors' representatives about what products would be available for sale in the coming year. (N.T. 6/7/93, 100–101)

17. At the time that the Lashingers and Gambones were negotiating with Mr. Marchese for the sale of 66% of the stock of B.J.M., Jr., Inc., the All–Star dealership was sold-out-of-trust in the amount of $226,000. The dealership had been placed on finance hold by Chrysler Credit Corporation since March of 1989 with the effect that it hadn't been able to acquire new or used vehicles for its inventory since that time. (N.T. 6/3/93, 26–27; 6/7/93, 101–102)

18. Although Chrysler Credit did not then declare B.J.M., Jr., Inc. in default under its Security/Credit Agreements as a result of the out-of-trust situation in early November, 1989, Mr. Tallant did threaten to "padlock the doors" of the dealership if settlement with Lashinger and Gambone could not be immediately consummated. (N.T. 6/7/93, 102–103)

19. At the time of their acquisition of 66% of the B.J.M., Jr., Inc. stock and as a further condition of Chrysler Credit's approval of the buy-sell agreement, the Lashingers and the Gambones executed continuing personal guarantees of the debts of B.J.M., Jr., Inc. in favor of Chrysler Credit Corporation. (N.T. 6/3/93, 7–8; Exhibits P–6, P–7)

20. As of May 6, 1988, the All–Star Jeep/Eagle dealership had a line of credit with Chrysler Credit Corporation of $2.2 million. (N.T. 6/3/93, 5–6, 55–59; Exhibit P–1)

21. B.J.M., Jr., Inc./All–Star did not have to finance its wholesale purchases of vehicles through Chrysler Credit Corporation. Although not many banks or financing companies offer wholesale business financing, B.J.M. could have gone to *any* bank or finance company that offered such financing to finance its inventory. (N.T. 6/9/93, 113–114) Chrysler Credit did offer an incentive to dealerships to finance through them in the form of their dealer reserve program whereby they would pay a small amount in give monies to the dealer for all vehicles financed. (N.T. 6/8/93, 26–27)

22. Upon the Lashingers' and the Gambones' purchase of the B.J.M. stock in November, 1989, Chrysler Credit Corporation revised the dealership's line of credit for the purchase of new vehicles to $1 million and to $60,000 for the purchase of used vehicles. (N.T. 6/3/93, 61; 6/8/93, 18)

23. Notwithstanding that the dealership's line of credit had been reduced to $1,060,000 upon the partial buy-out in November, 1989, Chrysler Credit took no action with respect to reducing B.J.M.'s then-existing inventory of new and used vehicles. (N.T. 6/7/93, 116–119)

24. Chrysler Credit Corporation received notice every time the factory (Chrysler Motors) sent new vehicles to the All–Star Jeep/Eagle dealership and thus knew how much of its credit line the dealership was using at any given time. (N.T. 6/3/93, 67)

25. Chrysler Credit Corporation and George Tallant, as Branch Manager for the Horsham, Pennsylvania office of Chrysler Credit Corporation were responsible for ensuring that B.J.M., Jr., Inc. did not over-extend its line of credit. (N.T. 6/3/93, 64)

26. If a dealership's line of credit gets too high and the dealership gets too many financed vehicles, it runs the risk of being

unable to pay the interest on those vehicles and the dealership could be "strangled." (N.T. 6/3/93, 63)

27. At some point between November, 1989 and November, 1991, George Tallant and Chrysler Credit Corporation allowed B.J.M., Jr., Inc. trading as All–Star Jeep/Eagle to over-extend its $1,060,000 credit limit to nearly $2 million. (N.T. 6/3/93, 64)

28. In January of 1991, B.J.M. was again found to be sold out-of-trust to Chrysler Credit in the approximate amount of $200,-000. (N.T. 6/3/93, 9; 6/8/93, 46–47)

29. On January 25, 1991, Chrysler Credit declared the dealership to be in default of the financing/security and master credit agreements and notified B.J.M. and its principals (Lashinger and Gambone) that it was accelerating the balance due under the agreements. However, as an "accommodation" to the dealership, Chrysler Credit would keep the dealership on its "finance hold" status and would "withhold taking further action until February 28, 1991, in order to permit the dealership time to pay off the debt in full through other financing or other means." (N.T. 6/8/93, 47; Exhibits P–41a, P–41b, P–41c)

30. Although B.J.M. was able to continue to operate the business with its existing inventory, it could not acquire any additional new or used cars until it satisfied the sold out-of-trust condition. (N.T. 6/8/93, 47–48)

31. In February, 1991, Messrs. Lashinger and Gambone met with Mr. Tallant in an effort to agree on the means to satisfy the out-of-trust situation. At that time, there were three options potentially available to cure the dealership's problems: recapitalization and refinancing of the company, consolidation of B.J.M.'s Jeep/Eagle franchise with the local Chrysler/Plymouth franchise and a direct sale of the franchise to another entity. (N.T. 6/8/93, 48–53)

32. Shortly thereafter, Mr. Lashinger and Mr. Gambone began separate negotiations for both a consolidation and an outright sale of the franchise with the local Chrysler/Plymouth franchise and with the principals of Norco Jeep/Eagle and Murray Dodge. At that time, however, Chrysler Motors Corporation would not allow consolidation because of existing company policy to not permit such a merger in major metropolitan areas and no agreement could be reached for the sale of the franchise. That policy, however, was changed in or about July, 1991. (N.T. 6/8/93, 48–55; Exhibit D–39)

33. After further discussions with George Tallant and Chrysler Credit Corporation, an agreement was eventually reached in or about April, 1991 for the refinancing and recapitalization of the B.J.M. dealership. Under the terms of the recapitalization, B.J.M. borrowed $150,000 from Chrysler Motors Corporation and $100,000 from the Madison Bank; Gambone and Lashinger supplied another $125,000 in loans and B.J. Marchese forgave the corporation's existing debt to him in consideration for Chrysler Credit Corporation's release of his personal guaranty. (N.T. 6/3/93, 9–10; 6/8/93, 56–62; Exhibits P–36, D–32)

34. In conjunction with the refinancing, Mr. Lashinger and Mr. and Mrs. Gambone were required to and did execute among other things, an Agreement to Reaffirm their personal guarantees of the corporation's debts, another Security Agreement and Master Credit Agreement, an Agreement to Pay Wholesale Interest Charges in Arrears, and General Releases of Claims against Chrysler Credit Corporation, Wholesale Cash Transfer Check Authorization and new UCC–1 Financing Statements. (N.T. 6/3/93, 9–14; 6/8/93, 62–64, 70–74, 129–140; Exhibits P–5, P–8, P–9, P–10, P–11, P–13, P–14, P–14a, P–15, P–16, P–33, P–34, P–35) The Wholesale Cash Transfer Check Authorization gave Chrysler Credit Corporation authority to draw Cash Transfer Checks on B.J.M.'s Madison Bank account to meet the wholesale payments due it for vehicles sold. (P–33)

35. Despite the fact that Messrs. Gambone and Lashinger were $50,000 short in terms of the amount of money they were to loan the company, the parties closed on the recapitalization of the dealership and the sold-out-of-trust condition was remedied on or about May 31, 1991. (N.T. 6/8/93, 77, 151–154)

36. In conjunction with the Spring, 1991 recapitalization of the dealership, B.J.M., Jr., Inc. through its principals Lashinger and Gambone, again gave a security interest to Chrysler Credit Corporation in the same items covered by the May, 1988, November, 1989 and November, 1990 security interests. This interest, in turn, was recorded on April 22, 1991. (N.T. 6/03/93, 39–40; Exhibit P–5)

37. On May 30 and May 31, 1993, via correspondence, Messrs. Gambone and Lashinger notified Mr. Tallant that they approved of his extension of their new and used car credit lines above the previous limits of $1 million and $60,000 respectively. (N.T. 6/3/93, 17–18; 6/8/83, 155–157; Exhibits P–29, P–30)

38. On or about June 3, 1991, Chrysler Credit Corporation re-opened B.J.M.'s lines of credit and on June 5, 1991, removed the dealership from the direct assignment of factory monies that had been lodged against it on November 8, 1991, thus enabling B.J.M. to again receive the rebates and other receivables due it from the factory. (Exhibits P–30, P–31 and P–37; N.T. 6/3/93, 15–19)

39. Notwithstanding that B.J.M./All-Star's credit lines were re-opened in early June, 1991, the dealership was unable to meet Chrysler Motors' April and May, 1991 "build-out" deadlines for placing factory orders for the end of the 1991 model year with the result that B.J.M. could not get additional new vehicle inventory except by dealer trading until the new year models could be delivered in August or September. (N.T. 6/8/93, 78–81)

40. As a general rule, it is not profitable for a dealership to obtain its inventory by means of dealer trading because most dealerships in the Philadelphia area sell vehicles at invoice prices and the selling dealer usually sells the vehicle minus the factory holdback money. Since the holdback money represents the profit in the car, a dealership which is forced to dealer trade for inventory is not competitive. Factory holdback monies, in turn, will become a receivable to the dealership from the factory. (N.T. 6/8/93, 21, 23, 80–81)

41. On October 21, 1991, Chrysler Credit Corporation conducted a car check or wholesale inventory audit at the B.J.M. dealership and discovered (1) that the dealership had, within the preceding two weeks, sold a number of vehicles for which it had failed to remit payment to Chrysler Credit Corporation; (2) that several vehicles that had been designated as demonstrator models had actually been sold; (3) and that the dealership still had in its possession several certificates of origin for vehicles that had been sold. (N.T. 6/3/93, 21–22; 6/4/93, 92–97, 153–154)

42. Chrysler Credit followed up the October 21, 1991 car check with a full wholesale audit of All–Star on November 1, 1991. Although that audit had results which were satisfactory to Chrysler Credit, in the course of that audit, Mr. Muscara and several other Chrysler Credit representatives that were present at the dealership on that date, directed All–Star's office manager to fax into Chrysler Credit's office the serial numbers of several sold vehicles on which the final paperwork had yet to be processed and the checks deposited. (N.T. 6/3/93, 22–23, 72–75; 6/4/93, 97–99, 172–174)

43. On November 1, 1991, the same date as the wholesale audit, Chrysler Credit drew a check payable to itself in the amount of $65,857.30 on B.J.M.'s account in payment of the wholesale vehicles which it had floor-planned. It subsequently drew two additional checks payable to itself on the B.J.M. account on November 4 and November 6, 1991 in the amounts of $45,803.79 and $20,929.97, respectively. (N.T. 6/3/93, 24, 75; 6/4/93, 174)

44. On November 7, 1991, George Tallant was informed by Chrysler Credit's bank that the three checks had been returned for non-sufficient funds. Mr. Tallant then contacted Mr. Gambone and requested that the returned checks immediately be certified. Mr. Gambone, however, could not have the checks certified because the funds were not then available in or to B.J.M.'s Madison Bank account. (N.T. 6/3/93, 24–25; Exhibit P–17)

45. On November 7, 1991, Mr. Tallant again put the B.J.M. dealership on finance hold and lodged an assignment of factory

monies/receivables against it. In addition, he reported the returned checks to Chrysler Credit's eastern area credit committee and was instructed to seek the issuance of a restraining order against All–Star from the Court. (N.T. 6/3/93, 26–28)

46. On November 8, 1991, Judge Bechtle issued a temporary restraining order against B.J.M., Jr., Inc. preventing it from further disposing of its new or used car inventory pending a full hearing on the merits which was then scheduled for November 18, 1991. (N.T. 6/8/93, 82–83)

47. Although Chrysler Credit was asked to re-deposit the checks that had been returned for payment, it declined to do so. (N.T. 6/3/93, 119; 6/4/93, 65–69; 6/9/93, 14–16)

48. On or about the same date as the temporary restraining order was obtained, Chrysler Credit Corporation's credit committee declared B.J.M., Jr., Inc. to again be in default of the financing/security and credit agreement. Unlike the January, 1991 declaration of default, however, no formal written notice of default was ever issued to B.J.M., Jr., Inc. or its principals. (N.T. 6/3/93, 76–80, 120)

49. Paragraph 9.0 of the Security Agreement and Master Credit Agreement executed by the parties on May 20, 1991 states that "[A]ny notice given hereunder shall be in writing and given by personal delivery or shall be sent by United States Mail, postage prepaid, addressed to the party to be charged with such notice at the respective address set forth below ..." (Exhibit P–17)

50. Between 1989 and 1991, Chrysler Motors promoted many of its Jeep/Eagle products through the use of rebate programs. Because most customers elect to take their rebates off the price of the vehicle they are buying, it is the dealer (not the customer) which must wait to receive the rebate from Chrysler Motors and rebates therefore become receivables for a dealership. (N.T. 6/8/93, 22–24)

51. It was not uncommon for the All–Star Jeep/Eagle dealership to wait anywhere between two and six weeks to receive a rebate check from Chrysler Motors Corporation. (N.T. 6/8/93, 25)

52. Irrespective of the fact that All–Star often had to wait up to six weeks to receive a rebate, Chrysler Credit demanded and expected payment in full for any and all vehicles sold within seven days of the sale of the vehicle. Although the factory did not pay interest on the rebate money, interest would continue to be charged by Chrysler Credit until the vehicle(s) sold were paid for in full. (N.T. 6/3/93, 121–123; 6/4/93, 93–94; 6/8/93, 25–26)

53. At the time that Chrysler Credit orally declared B.J.M./All–Star to be in default in November, 1991, Chrysler Motors owed the dealership some $140,000 from rebates and other promotional and advertising programs. Those receivables were assigned to and paid directly to Chrysler Credit after the default was declared. (N.T. 6/8/93, 29, 229–231; 6/3/93, 154–157, 165–166; Exhibit D–1A)

54. As of November 26, 1991, the All–Star dealership's sold-out-of-trust condition totalled $240,865.20. (N.T. 6/3/93, 28; Exhibit P–18)

55. On November 27, 1991, Chrysler Credit Corporation's motion for writ of seizure and preliminary injunctive relief against B.J.M., Jr., Inc., Lashinger and Gambone was heard before Judge Bechtle. B.J.M. was permitted to continue its operations and to retain possession of its motor vehicle inventory at that time. (N.T. 6/8/93, 83–84)

56. On January 14, 1992, B.J.M., Jr., Inc., trading as All–Star Jeep/Eagle filed a Petition for Relief under Chapter 11 of the United States Bankruptcy Code and the dealership continued to operate in January and February, 1992 under the Chapter 11 umbrella. (N.T. 6/3/93, 31–32) On February 19, 1992, Judge Bechtle ordered that this case be placed in suspense pending the outcome of the bankruptcy proceedings.

57. On March 18, 1992, following hearing, United States Bankruptcy Judge Scholl entered an order upon agreement of counsel granting the VMDT Partnership, All–Star/B.J.M.'s landlord, relief from the automatic stay provisions of the Bankruptcy Code and directing B.J.M. to vacate the premises at

2431 West Main Street in Norristown "on or before April 1, 1992." (N.T. 6/9/93, 123; Exhibit P–45)

58. In addition to their attorneys and counsel for the landlord and the bankruptcy counsel for the corporate debtor, B.J.M., Jr., Inc., Messrs. Gambone, Lashinger and Tallant were all present at the March 18, 1992 hearing before Judge Scholl. At the conclusion of that hearing, Mr. Tallant, Mr. Gambone and Mr. Lashinger agreed that B.J.M.'s motor vehicle inventory would be turned over to Chrysler Credit Corporation and moved for storage to Jim Wynn's Volvo dealership and the Hatfield Auto Auction later that same day. (N.T. 6/03/93, 33; 6/08/93, 88–89; 6/09/93, 124; 6/04/93, 99–101)

59. At the direction of Edward Muscara, Chrysler Credit Corporation's representatives removed all of the motor vehicles from the All–Star dealership on March 18, 1992. Because the vehicles were moved from the parking lots and the showroom during a heavy rainstorm, the showroom, service area and other parts of the dealership were left with about 2 inches of rainwater inside. (N.T. 6/04/93, 100)

60. In addition to discussing the turnover of the motor vehicle inventory immediately after the March 18, 1992 bankruptcy hearing, those same individuals also discussed scheduling a time for Chrysler Credit's repossession of the dealership's fixed assets, furnishings and equipment on either March 24 or March 27, 1992. However, no clear agreement was ever reached with respect to either date. (N.T. 6/03/93, 32–33; 6/08/93, 89–90, 165–169; 6/09/93, 125–126)

61. On March 27, 1992, Edward Muscara arrived at the B.J.M. dealership at 9:00 a.m. with Jay and Luke Whitman from the Omar Landis Auction Company and several of their employees to seize the furniture, equipment and other fixed assets of the business. They were met there by one Robert Cornog, a representative of the VMDT partnership and were given access to the premises. (N.T. 6/04/93, 105–106; 6/07/93, 18, 70) At that time, although the electricity had been turned off, the dealership's offices appeared to be in relatively the same condition as though the business was still operational. (N.T. 6/07/93, 18–20, 71–72)

62. At Mr. Muscara's direction, the Omar Landis employees emptied and removed all of the furniture, file cabinets, computers, telephones, fax machines, copiers and all other equipment from the dealership's premises for transport to the Landis Auction facility in Ephrata, Pennsylvania. In the course of moving the furniture and equipment, nearly all of B.J.M., Jr., Inc.'s files and records were spilled, co-mingled, piled and strewn throughout the dealership's offices. Many of the records were also trampled upon. (N.T. 6/04/93, 106–108, 126–130, 132–133; 6/08/93, 90–93, 172–173; 6/09/93, 9–12, 68–70, 134–136; Exhibits D–31, D–42, D–43, D–44)

63. Justin Gambone arrived at the dealership at 1:30 p.m. on March 27, 1992 at which time the Chrysler Credit representatives and Omar Landis employees were taking a lunch break. Upon observing the condition of the files and records of the business, Mr. Gambone notified Mr. Lashinger and asked that he contact the local police department. (N.T. 6/04/93, 108–109; 6/07/93, 21–22, 73–74; 6/08/93, 90–91; 6/09/93, 68–74)

64. A short time thereafter, Mr. Lashinger as well as six officers from the West Norriton Township Police Department arrived at the All–Star premises. At the direction of the police, the representatives of Chrysler Credit Corporation and the Omar Landis Auction Company discontinued their seizure of the furniture and equipment, padlocked the trucks on which many of the already-removed items had been placed, and left the site. (N.T. 6/03/93, 34–36; N.T. 6/04/93, 109–110, 111–123, 141–144; 6/07/93, 21–23, 75–80; 6/08/93, 91–95)

65. In response to Mr. Lashinger's request, Chrysler Credit Corporation hired a moving company to return to the All–Star premises and pack up the files and records that had been dispersed in the course of the repossession and set them aside for Messrs. Lashinger and Gambone to move. Nevertheless, neither Mr. Gambone nor Mr. Lashinger endeavored to re-create or re-assemble the files and records in an orderly fashion. (N.T. 6/08/93, 171–174)

66. On April 7, 1992, Judge Scholl approved and entered a Consent Order granting Chrysler Credit Corporation's Motion for Relief from the Automatic Stay under 11 U.S.C. § 362 of the U.S. Bankruptcy Code and permitting Chrysler Credit to "proceed to recover possession of any and all collateral or other assets of the Debtor-in Possession (B.J.M., Jr., Inc.) which are subject to the lien of Chrysler Credit Corporation including but not limited to the inventory of new and used motor vehicles, fixtures, furniture and equipment and automotive parts. (N.T. 6/03/93, 33; 6/08/93, 89–90; Exhibit P–26)

67. Although the fact that B.J.M.'s business records were not intact may have somewhat diminished the value of the franchise because B.J.M. could not produce its sales and service customer lists, the amount realized through the sale of the franchise in bankruptcy to the Sport Group was only some $8,000 less than would have been realized had B.J.M., Jr., Inc. sold it to the party with whom it had previously been negotiating, Armand Cadillac/Oldsmobile. (N.T. 6/08/93, 85–89, 181–187; 6/09/93, 26–27; Exhibit P–27)

68. In the course of the seizure of B.J.M., Jr., Inc.'s fixtures, equipment and furniture, Chrysler Credit Corporation seized a telephone system leased through the Century Leasing Co. and computer equipment leased through First People's Bank of New Jersey. As of December 31, 1991, the balance due under the First People's lease was $31,914.34 while $15,185.92 remained due and owing under the Century Equipment lease. (N.T. 6/08/93, 95–96; 6/09/93, 41–43; Exhibits D–38a, D–38b)

69. On April 3, 1992, counsel for Chrysler Credit Corporation sent correspondence to the Lashingers, the Gambones, and the Harveys (who were then principals in the corporation) and bankruptcy counsel for B.J.M., Jr., Inc. via certified mail, return receipt requested, notifying them that "the inventory of furniture, fixtures, equipment, goods, machinery, tools, parts and accessories which were repossessed from the B.J.M., Jr., Inc. dealership" would be sold at auction at the J. Omar Landis Auction Co., Apple and Robert Streets in Ephrata, Pennsylvania on April 11, 1992 at 8:30 a.m. With the exception of the Lashingers, who did not claim their notification letter, the Gambones and the Harveys received their notices on April 6, 1992. (Exhibit P–23)

70. Neither Justin or Carol Gambone nor Joseph Lashinger attended the auction nor did they or B.J.M., Jr., Inc send any representatives to attend the April 11, 1992 auction. (N.T. 6/09/93, 89–90)

71. B.J. Marchese, Jr. remained a stockholder/principal in B.J.M., Jr., Inc. until November, 1990 when he sold his remaining interest in the company to one John Godsey. Mr. Godsey, in turn, remained a principal in B.J.M., Jr., Inc. until May, 1991 when he defaulted on his obligations under his stock purchase agreement with B.J. Marchese, Jr. and Mr. Marchese resold the stock to Mary and Charles Harvey. Chrysler Credit Corporation, however, never requested or required that the Harveys execute personal guarantees on B.J.M., Jr., Inc.'s debts. (N.T. 6/08/93, 207–209)

72. On July 30, 1992, Judge Scholl entered an Order Approving, Ratifying and Confirming an Agreement of Sale of B.J.M., Jr., Inc.'s Jeep/Eagle franchise to RCP II, Inc., t/a the Sport Group for the sum of $408,000. Of that $408,000, $148,000 is payable directly to Chrysler Motors and $36,122.50 is payable to B.J.M., Jr., Inc.'s bankruptcy counsel. (N.T. 6/03/93, 33–34, 43, 156–159; 6/08/93, 184–185; Exhibits P–24, P–27)

73. With the exception of the twenty-six new vehicles that were repurchased by the factory, Chrysler Credit Corporation had B.J.M., Jr., Inc.'s motor vehicle inventory auctioned at the Hatfield Auto Auction in Hatfield, Pennsylvania at a series of closed, dealers-only auctions. (N.T. 6/03/93, 94–97; 6/09/93, 6–9, 58–62, 153–156; Exhibit P–20)

74. Chrysler Credit Corporation did not give any notice, written or otherwise, to B.J.M., Jr., Inc. or any of its principals (including Lashinger and Gambone) of the times, dates and places of the auctions of its motor vehicle inventory, nor did it make any efforts to advertise the auctions. (N.T. 6/03/93, 94–99; 6/09/93, 5–7)

75. As a general rule, the best manner in which to dispose of motor vehicle inventory is to sell it at retail, and the second best manner is to dispose of the entire inventory at an open auction at the site. (N.T. 6/09/93, 7–9, 159–163)

76. Notwithstanding that Chrysler Credit Corporation auctioned B.J.M., Jr., Inc.'s motor vehicle inventory at a closed, dealers-only auction, the vehicles auctioned sold on the average for 110% of their average book value. (N.T. 6/09/93, 154–155, 165; Exhibit P–20)

77. Despite the results of the Hatfield auctions, there was a shortfall on B.J.M.'s floorplanned inventory (including the costs incurred in repossessing and liquidating the inventory) totalling $665,578.12. (N.T. 6/03/93, 39–41, 184–186)

78. The April 11, 1992 auction of B.J.M.'s furniture, fixtures and equipment was advertised as part of Omar Landis Company's 19th Annual Equipment Auction through TNT, a national publication and through the posting of sales flyers. Although the advertising notices represented that the sale would include "a complete dispersal of two automotive dealerships—one Chrysler and one import," All–Star Jeep/Eagle was not identified by name. (N.T. 6/07/93, 24–26; Exhibit D–47)

79. Some 2,000 people attended the April 22, 1992 auction. B.J.M.'s phone system was sold for $95, the three safes were sold for $175 and the three computers were sold for a total of $30. The proceeds from the sale of all of the furniture, fixtures and equipment, after expenses, totalled $13,050.01, which sum was paid directly to Chrysler Credit Corporation. (N.T. 6/03/93, 39–41; 6/07/93, 26, 56–59; Exhibit P–21)

80. As a result of the parts inventory and the return of the repair parts from All–Star's service department to the factory, Chrysler Credit has given B.J.M., Jr., Inc. a credit of $68,552.76 against its indebtedness. (N.T. 6/03/93, 41–42; Exhibits P–22, D–26)

81. On January 27, 1993, Chrysler Credit Corporation settled a claim made against it by the Internal Revenue Service for conversion of the IRS tax liens on the assets of B.J.M., Jr., Inc. as the result of its reclamation of the corporations' collateral. Under the terms of the settlement, Chrysler Credit agreed to pay the sum of $80,000 to the IRS by no later than February 1, 1994. (N.T. 6/03/93, 45; 6/08/93, 65–68; Exhibit P–32)

## DISCUSSION

In addition to the recitation of the foregoing facts, a brief overview of the rather protracted procedural history of this case would also appear to be a necessary pre-requisite to a thorough analysis of the legal issues raised by these parties. Following Chrysler Credit's filing of its amended complaint on November 26, 1991 for breach of the terms of the Security and Master Credit Agreement, B.J.M., Jr., Inc., Mr. Lashinger and Mr. and Mrs. Gambone (hereinafter the "B.J.M. parties") filed an answer denying all liability and raising as affirmative defenses (1) that plaintiff Chrysler Credit acted in bad faith and was negligent; (2) waiver; (3) failure to state a claim; (4) estoppel; (5) failure to join the Harveys as necessary parties; and (6) that they never knew of and plaintiff misled them as to the existence of the $2.2 million promissory note that B.J. Marchese executed on behalf of the corporation on May 6, 1988. The B.J.M. parties also filed a number of counterclaims at the time asserting: (1) that plaintiff Chrysler Credit prematurely declared a default; (2) that Chrysler Credit's ill-managed credit program damaged their business; (3) that plaintiff failed to remit withheld sales tax and titling fees; (4) that plaintiff tortiously interfered with the sale of the franchise and B.J.M.'s business; (5) that Chrysler Credit knew and permitted B.J.M., Jr., Inc. to be undercapitalized; and (6) lender liability for default.

On March 9, 1992, Chrysler Credit filed its answer to the B.J.M. parties' counterclaims denying that it was liable under any of the theories alleged and raising the affirmative defenses of no duty owed, contributory negligence and failure to state a claim upon which relief could be granted. Additionally, Chrysler Credit submits that Messrs. Gambone and Lashinger do not possess the requisite standing to pursue these claims on behalf of the bankrupt corporation.

Thereafter, on July 10, 1992, the B.J.M. parties filed suit in the Court of Common Pleas of Montgomery County, Pennsylvania against Chrysler Credit Corporation, George

Tallant, Edward Muscara and its former landlord, PLS Properties/VMDT partnership alleging, *inter alia*, that those defendants unlawfully seized and converted B.J.M.'s assets, inventory, equipment and fixtures, causing severe property damage and loss and subjecting the B.J.M. parties to lawsuits by other creditors. That action was removed to this Court on July 30, 1992, assigned docket number 92–4490 and was subsequently consolidated with the original lawsuit at # 91–6996. PLS Properties was later dismissed from this action by stipulation of the parties.[1]

## I. THE CLAIMS OF CHRYSLER CREDIT CORPORATION

In essence, Chrysler Credit Corporation (or "CCC") bases its complaint entirely upon the terms of the Master Credit and Security Agreement which it made with B.J.M., Jr., Inc. in May, 1988 and May, 1991, (hereinafter "the credit and security agreement"). Pursuant to that agreement, plaintiff contends the parties agreed that CCC would supply financing solely for the purpose of enabling B.J.M., Jr., Inc. to acquire motor vehicle inventory and that interest would begin accruing at the time each advance of credit was made. Chrysler Credit further notes that the agreement provides that, among other things, the failure to pay interest and/or the principal amount of an advance constitutes an event of default for which it, as the secured party, could take immediate possession of the vehicles financed without demand or legal process and could exercise all of its rights under the common or statutory law or the Uniform Commercial Code.[2]

Consequently, CCC asserts that under this agreement and the personal and continuing guarantees which Mr. Lashinger and Mr. and Mrs. Gambone gave on behalf of the

---

1. Similarly, Joseph Lashinger's wife, Maria, with whom he is involved in ongoing divorce proceedings, was dismissed via stipulation of all parties on March 1, 1993.

2. Specifically, the Security and Master Credit Agreement upon which Chrysler Credit relies reads, in relevant part:

 **2.1** Debtor agrees that financing pursuant to this Agreement shall be used exclusively for the purpose of acquiring Vehicles for Debtor's inventory and Debtor shall not sell or otherwise dispose of such Vehicles except by sale in the ordinary course of business. If so requested by Secured Party, Debtor agrees to maintain a separate bank account into which all cash proceeds of cash sales or other dispositions of such Vehicle will be deposited. Debtor further agrees that upon the sale of each Vehicle with respect to which an Advance has been made by Secured Party, Debtor will promptly remit to Secured Party the total amount then outstanding of Secured Party's Advance on each such Vehicle unless other terms of repayment have been agreed to by Secured Party. Debtor agrees to hold in trust for Secured Party and shall forthwith remit to Secured Party, to the extent of any unpaid and past due indebtedness hereunder, all proceeds of each Vehicle when received by Debtor, or to allow Secured Party to make direct collection thereof and credit Debtor with all sums received by Secured Party.

 **6.0** *Events of Default and Remedies/Termination*—Time is of the essence herein and it is understood and agreed that Secured Party may terminate this Agreement, refuse to advance funds hereunder, and declare the aggregate of all Advances outstanding hereunder immediately due and payable upon the occurrence of any of the following events (each hereinafter called an "Event of Default"), and the Debtor's liabilities under this sentence shall constitute additional obligations of Debtor secured under this Agreement.

 (a) Debtor shall fail to make any payment to Secured Party, whether constituting the principal amount of any Advance, interest thereon or any other payment due hereunder, when and as due in accordance with the terms of this Agreement or with any demand permitted to be made by Secured Party under this Agreement or any Promissory Note, or shall fail to pay when due any other amount owing to Secured Party under any other agreement between Secured Party and Debtor, or shall fail in the due performance or compliance with any other term or condition hereof or thereof, or shall be in default in the payment of any liabilities constituting indebtedness for money borrowed or the deferred payment of the purchase price of property or a rental payment with respect to property material to the conduct of Debtor's business;

 (b) A tax lien or notice thereof shall have been filed against any of the Debtor's property or a proceeding in bankruptcy, insolvency or receivership shall be instituted by or against Debtor or Debtor's property or an assignment shall have been made by Debtor for the benefit of creditors;

 (c) In the event that Secured Party deems itself insecure for any reason or the Vehicles are deemed by Secured Party to be in danger of misuse, loss, seizure or confiscation or other disposition not authorized by this Agreement;

 (d) Termination of any franchise authorizing Debtor to sell Vehicles;

defendant dealership, it is entitled to a judgment in its favor against the Gambones and Lashinger personally for the deficiency damages which it sustained on the sale of the motor vehicle inventory together with wholesale interest arrearages and expenses as the result of B.J.M.'s having breached the agreement by selling vehicles "out of trust."

### A. Creation of a Security Interest

■ It is well-settled that under § 1201 of the Pennsylvania Uniform Commercial Code, the term "security interest" is defined generally as "an interest in personal property or fixtures which secures payment or performance of an obligation." 13 Pa.C.S.A. § 1201. While the determination of whether a security interest exists initially depends upon the intent of the parties to the transaction, the question of intent is but one factor to be considered. *Bonczek v. Pascoe Equipment Co.*, 304 Pa.Super. 11, 450 A.2d 75, 79 (1982). To create a security interest which is valid and enforceable against the debtor and third parties, three factors must coalesce: (1) the collateral must be in the possession of the secured creditor or the debtor must sign a security agreement which contains a description of the collateral, (2) value must have been given, and (3) the debtor must have rights in the collateral. Upon the completion of all of these steps, the security interest will be said to have "attached" and will then become enforceable against the debtor. *Matter of Tressler*, 771 F.2d 791 (3rd Cir. 1985); *Kendrick v. Headwaters Production Credit Association*, 362 Pa.Super. 1, 523 A.2d 395, 397 (1987); *Commonwealth v. Quigley*, 344 Pa.Super. 607, 497 A.2d 257 (1985); 13 Pa.C.S.A. § 9203(a), (b).

To withstand a challenge from other potential secured creditors, however, it is not enough for a security interest to merely have been attached—it must also be perfected. *See, e.g.: In re Woolaghan*, 140 B.R. 377, 386 (Bankr.W.D.Pa.1992). 13 Pa.C.S.A. § 9303(a) provides that "a security interest is perfected when it has attached and when all of the applicable steps for perfection have been taken." Under §§ 9302, 9304 and 9401, most security interests are perfected by filing a financing statement in the office of the Prothonotary in the County where the debtor's place of business is located and in the Office of the Secretary of the Commonwealth. In the case of a security interest in fixtures, the financing statement must be filed in the office where a mortgage on the real estate would be recorded.[3]

Applying the preceding principles to the matter at bar, it is clear that in May, 1988 and again in May, 1991, B.J.M., Jr., Inc. gave

---

(e) A misrepresentation by Debtor for the purpose of obtaining credit or an extension of credit or a refusal by Debtor to execute documents relating to the Collateral and/or Secured Party's security interest therein or to furnish financial information to Secured Party at reasonable intervals or to permit persons designated by Secured Party to examine Debtor's books or records and to make periodic inspections of the Collateral; or

(f) Debtor, without Secured Party's prior written consent, shall guarantee, endorse or otherwise become surety for or upon the obligations of others except as may be done in the ordinary course of Debtor's business, shall transfer or otherwise dispose of any proprietary, partnership or share interest Debtor has in his business, or all or substantially all of the assets thereof, shall enter into any merger or consolidation, if a corporation, or shall make any substantial disbursements of use of funds of Debtor's business, except as may be done in the ordinary course of Debtor's business, or assign this Agreement in whole or in part or any obligation hereunder. ·

Upon the occurrence of an Event of Default, Secured Party may take immediate possession of said Vehicles without demand or further notice and without legal process; and for the purpose and furtherance thereof, Debtor shall, if Secured Party so requests, assemble the Vehicles and make them available to Secured Party at a reasonably convenient place designated by Secured Party and Secured Party shall have the right, and Debtor hereby authorizes and empowers Secured Party to enter upon the premises wherever said Vehicles may be, to remove same. In addition, Secured Party or its assigns shall have all the rights and remedies applicable under the Uniform Commercial Code or under any other statute or at common law or in equity or under this Agreement. Such rights and remedies shall be cumulative. Debtor hereby agrees that it shall pay all expenses and reimburse Secured Party for any expenditures, including reasonable attorneys' fees and legal expenses, in connection with Secured Party's exercise of any of its rights and remedies under this Agreement. ·

3. To be sure, those sections state, in pertinent part:

**§ 9302. When filing is required to perfect security interest; security interest to which filing provisions of division do not apply**

Chrysler Credit a security interest in all of its inventory, chattel paper, accounts, contract rights, documents, instruments, consumer goods, general intangibles, equipment, fixtures and leasehold improvements, furniture, machinery, tools and inventory of automotive parts, accessories and supplies and that these security interests were recorded in both the office of the Secretary of the Commonwealth/State and in the office of the Montgomery County Prothonotary. Thus,

this Court can reach no other conclusion but that Chrysler Credit Corporation has a perfected and hence a valid and enforceable security interest in everything outlined above but B.J.M.'s fixtures.[4]

## B. *Priority Among Conflicting Security Interests*

As was noted in Finding of Fact No. 13, in November, 1989 and again in November,

(a) **General rule.**—A financing statement must be filed to perfect all security interests except the following:

(1) a security interest in collateral in possession of the secured party under section 9305 (relating to when possession by secured party perfects security interest without filing);

(2) a security interest temporarily perfected in instruments or documents without delivery under section 9304 (relating to perfection of security interest in instruments, documents and goods covered by documents) or in proceeds for a ten-day period under section 9306 (relating to "proceeds"; rights of secured party on disposition of collateral);

(3) a security interest created by an assignment of a beneficial interest in a trust or a decedent's estate;

(4) a purchase money security interest in consumer goods; but filing is required for a motor vehicle required to be registered; and fixture filing is required for priority over conflicting interests in fixtures to the extent provided in section 9313;

(5) an assignment of accounts which does not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts of the assignor;

(6) a security interest of a collecting bank (section 4210) or in securities (section 8321) or arising under Division 2 (relating to sales) (see section 9113) or covered in subsection (c); and

(7) an assignment for the benefit of all the creditors of the transferor, and subsequent transfers by the assignee thereunder.

§ 9304. **Perfection of security interest in instruments, documents and goods covered by documents; perfection by permissive filing; temporary perfection without filing or transfer of possession**
(a) **Chattel paper, negotiable documents, money and instruments.**—A security interest in chattel paper or negotiable documents (other than certificated securities or instruments which constitute part of chattel paper) can be perfected only by the secured party's taking possession, except as provided in subsection (d) and (e) and section 9306(b) and (c) (relat-

ing to "proceeds"; rights of secured party on disposition of collateral).

. . . . .

§ 9401. **Place of filing; erroneous filing; removal of collateral**
(a) **Place of filing.**—The proper place to file in order to perfect a security interest is as follows:

(1) When the collateral is equipment used in farming operations, or farm products, or accounts or general intangibles arising from or relating to the sale of farm products by a farmer, or consumer goods, then in the office of the prothonotary in the county of· the residence of the debtor or if the debtor is not a resident of this Commonwealth then in the office of the prothonotary in the county where the goods are kept, and in addition when the collateral is crops growing or to be grown in the office of the prothonotary in the county where the land on which the crops are growing or to be grown is located;

(2) When the collateral is timber to be cut or is minerals of the like (including oil and gas) or accounts subject to section 9103(e) (relating to perfection of security interests in multiple state transactions) or when the financing statement is filed as a fixture filing (section 9313) and the collateral is goods which are or are to become fixtures, then in the office where a mortgage on the real estate would be filed or recorded.

(3) In all other cases, in the office of the Secretary of the Commonwealth and in addition, if the debtor has a place of business in only one county of this Commonwealth, also in the office of the prothonotary of such county, or, if the debtor has no place of business in this Commonwealth, but resides in the Commonwealth, also in the office of the prothonotary of the county in which he resides.

4. To have perfected its security interest in B.J.M.'s fixtures, CCC would have had to have filed its financing statement with Montgomery County's Recorder of Deeds—not the prothonotary. *See:* 13 Pa.C.S.A. §§ 9313(a), 9401(a)(2). Inasmuch as goods are defined as fixtures when they become so related to particular real estate that an interest in them arises under real estate law [13 Pa.C.S.A. § 9312(a)] and it does not appear that any fixtures were repossessed in this

1990, B.J.M., Jr., Inc. also gave Madison Bank a security interest in all of its "property and assets, accounts, instruments, chattel paper, money, inventories, equipment, fixtures and all accessories, substitutions, and appurtenances thereto, documents, general intangibles, records, insurance policies and all cash and non-cash collateral." While it is unclear whether the bank may have filed earlier or in the Office of the Secretary of the Commonwealth, Exhibit P–39 reveals that a financing statement reflecting this security interest was filed in the Office of the Montgomery County Prothonotary on November 16, 1990. Accordingly, a review of the law governing priority among creditors is necessary.

▮ As a general rule, a creditor with a perfected security interest in collateral has, under the Uniform Commercial Code, an interest therein which is superior to that of unsecured creditors. *United States Fidelity & Guarantee Co. v. United Penn Bank*, 362 Pa.Super. 440, 524 A.2d 958, 960 (1987); 13 Pa.C.S.A. § 9201. Where two or more creditors have perfected security interests in the same collateral, however, 13 Pa.C.S.A. § 9312(e) provides that generally, the party who filed his security interest first will have priority even if he knew that another party had a prior but unperfected claim.[5] *In re Southwest Pennsylvania Natural Resources, Inc.*, 11 B.R. 900, 902 (Bankr.W.D.Pa.1981). *See Also: Bigelow–Sanford v. Security Peoples Trust Co.*, 304 Pa.Super. 167, 450 A.2d 154 (1982).

This is not to say that there are no exceptions to the general first in time-first in right rule. Indeed, § 9312(c) gives a purchase money security interest[6] in inventory priority over a conflicting security interest in the same inventory if:

(1) the purchase money security interest is perfected at the time the debtor receives possession of the inventory;

(2) the purchase money secured party gives notification in writing to the holder of the conflicting security interest if the holder had filed a financing statement covering the same types of inventory: (i) before the date of the filing made by the purchase money secured party; or (ii) before the beginning of the 21–day period where the purchase money security interest is temporarily perfected without filing or possession (section 9304(e));

(3) The holder of the conflicting security interest receives the notification within five years before the debtor receives possession of the inventory; and

(4) the notification states that the person giving the notice has or expects to acquire a purchase money security interest in inventory of the debtor, describing such inventory by item or type.

Sections 9312(a), (b) and (d), in turn outline still other exceptions for security interests in crops and purchase money security interests in goods other than inventory as well as for cases involving consignments and multiple state transactions. Finally, in the

---

case, this conclusion will have no effect on the outcome of this case. (*See, e.g.:* Exhibit P–21)

**5.** Specifically, § 9312(e) reads:

"In all cases not governed by other rules stated in this section (including cases of purchase money security interests which do not qualify for the special priorities set forth in subsections (c) and (d)), priority between conflicting security interests in the same collateral shall be determined according to the following rules:

(1) *Conflicting security interests* rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection."

(2) So long as conflicting security interests are unperfected, the first to attach has priority.

**6.** 13 Pa.C.S.A. § 9107 states that "a security interest is a purchase money security interest to the extent that it is: (1) taken or retained by the seller of the collateral to secure all or part of its price; or (2) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used."

Under § 9109, goods are considered "inventory if they are held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has so furnished them, or if they are raw materials, work in process or materials used or consumed in a business. Inventory of a person is not to be classified as his equipment."

absence of a stated date for maturity, a financing statement remains perfected for a period of five years. *Credit Alliance Corp. v. Jebco Coal Co., Inc.*, 688 F.2d 10, 12 (3rd Cir.1982); 13 Pa.C.S.A. § 9403(b).

In the instant case, we find that Chrysler Credit Corporation's security interest(s) clearly takes priority over those of the Madison Bank. Indeed, the record reflects that Chrysler Credit first filed its UCC–1 financing statements with both the Montgomery County Prothonotary and the Secretary of State's Office on June 3, 1988. (See Exhibits P–3 and P–4). On the other hand, while there is evidence that Madison Bank filed a UCC–1 financing statement evincing a security interest in all of B.J.M.'s property and assets with the Montgomery County Prothonotary on November 16, 1990, there is no evidence that a UCC–1 was filed with the Secretary of State's office. It therefore does not appear to this Court that Madison Bank properly perfected its security interest.[7]

## C. *Default*

■ Although "default" triggers the secured creditors' rights under Part 5 of Article 9 of the Uniform Commercial Code, nowhere does Article 9 define the word. Instead it leaves this to the parties and to any scraps of common law lying around. Apart from the modest limitations imposed by the unconscionability doctrine and the requirement of good faith, default is whatever the security agreement says it is. J. White & R. Summers, *Uniform Commercial Code*, § 26–2, 1085–1086 (2nd Ed.1980).

■ Notwithstanding the silence of the Code on what constitutes a default, Sections 9501, 9502, 9503, 9504, 9505 and 9506 delineate the rights and remedies which are available to the parties should a default occur. Generally speaking, under Article 9 of the Code, upon default the secured party can: (1) obtain a judgment on the debt; (2) repossess and sell the collateral or (3) repossess and retain the collateral in satisfaction of the debt. *Midlantic Commercial Leasing Corp. v. Architectural Shapes, Inc.*, 1990 WL 42257 (E.D.Pa.1990); 13 Pa.C.S.A. §§ 9501, 9504 and 9505. Section 9501 states, in pertinent part that "(a) when a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this chapter and, except as limited by subsection (c), those provided in the security agreement. He may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any judicial procedure ..."[8] Section

---

7. Moreover, to the extent that the bank had a security interest in the dealership's inventory, CCC's interest would obviously have to be afforded priority inasmuch as it is a purchase money security interest within the meaning of 13 Pa. C.S.A. § 9107. *See Also:* 13 Pa.C.S.A. § 9301(b).

8. Section 9501 reads in full:

 **§ 9501. Default; procedure when security agreement covers both real and personal property**
 (a) **Rights and remedies of secured party.**—When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this chapter and, except as limited by subsection (c), those provided in the security agreement. He may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure. If the collateral is documents the secured party may proceed either as to the documents or as to the goods covered thereby. A secured party in possession has the rights, remedies and duties provided in section 9207 (relating to rights and duties when collateral in possession of secured party). The rights and remedies referred to in this subsection are cumulative.
 (b) **Rights and remedies of debtor.**—After default, the debtor has the rights and remedies provided in this chapter, those provided in the security agreement and those provided in section 9207.
 (c) **Limitation on waiver of certain provisions.**—To the extent that they give rights to the debtor and impose duties on the secured party, the rules stated in the following provisions of this title may not be waived or varied except as provided with respect to compulsory disposition of collateral (sections 9504(c) and 9505) and with respect to redemption of collateral (section 9506) but the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable:
 (1) Section 9502(b) and section 9504(b) insofar as they require accounting for surplus proceeds of collateral.
 (2) Section 9504(c) and section 9505(a) which deal with disposition of collateral.
 (3) Section 9505(b) which deals with acceptance of collateral as discharge of obligation.
 (4) Section 9506 which deals with redemption of collateral.

9501(b) in turn provides that "after default, the debtor has the rights and remedies provided in this chapter, those provided in the security agreement and those provided in section 9207." [9] Of course, Section 1–203 of the Code, 13 Pa.C.S.A. § 1203 states that "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement." Good faith, in turn, has been defined as honesty in fact in the conduct or transaction concerned. *Lichtenstein v. Kidder, Peabody & Co. Inc.*, 777 F.Supp. 423, 427 (W.D.Pa.1991).

Pursuant to Sections 9502–9505, the secured party has the option of notifying account debtors of the debtor to make payments directly to the secured creditor, of taking possession of the collateral (either with or without legal process), of accepting the collateral in discharge of the debtor's obligation, or of disposing of the collateral and applying the proceeds of the sale toward satisfaction of the debt.

> (5) Section 9507(a) which deals with the liability of secured party for failure to comply with this chapter.
> (d) **Rights of secured party when agreement covers real and personal property.**—If the security agreement covers both real and personal property, the secured party may proceed under this chapter as to the personal property or he may proceed as to both the real and the personal property in accordance with his rights and remedies in respect of the real property in which case the provisions of this chapter do not apply.
> (e) **Reduction of secured claim to judgment.**—When a secured party has reduced his claim to judgment the lien of any levy which may be made upon his collateral by virtue of any execution based upon the judgment shall relate back to the date of the perfection of the security interest in such collateral. A judicial sale, pursuant to such execution, is a foreclosure of the security interest by judicial procedure within the meaning of this section, and the secured party may purchase at the sale and thereafter hold the collateral free of any other requirements of this division.

9. 13 Pa.C.S.A. § 9207, in turn, states:

> (a) **Duty of secured party to use reasonable care.**—A secured party must use reasonable care in the custody and preservation of collateral in his possession. In the case of an instrument or chattel paper reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed.

In those cases where the secured party elects to seize possession of the collateral and then dispose of it with an eye toward applying the proceeds from the sale against the debt, the secured party becomes subject to the requirements set forth in Section 9504(c) governing the manner of disposition of the collateral. *United States on behalf of Small Business Administration v. Gore*, 437 F.Supp. 344, 347 (E.D.Pa.1977). To be sure, that section dictates:

> Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or

> (b) **Rights and duties of parties.**—Unless otherwise agreed, when collateral is in the possession of the secured party:
> (1) reasonable expenses (including the cost of any insurance and payment of taxes or other charges) incurred in the custody, preservation, use or operation of the collateral are chargeable to the debtor and are secured by the collateral;
> (2) the risk of accidental loss or damages is on the debtor to the extent of any deficiency in any effective insurance coverage;
> (3) the secured party may hold as additional security any increase or profits (except money) received from the collateral, but money so received, unless remitted to the debtor, shall be applied in reduction of the secured obligation;
> (4) the secured party must keep the collateral identifiable but fungible collateral may be commingled; and
> (5) the secured party may repledge the collateral upon terms which do not impair the right of the debtor to redeem it.
> (c) **Liability of secured party for losses.**—A secured party is liable for any loss caused by his failure to meet any obligation imposed by subsections (a) and (b) but does not lose his security interest.
> (d) **Use of collateral by secured party.**—A secured party may use or operate the collateral for the purpose of preserving the collateral or its value or pursuant to the order of a court of appropriate jurisdiction or, except in the case of consumer goods, in the manner and to the extent provided in the security agreement.

reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale. In the case of consumer goods, no other notification need be sent. In other cases notification shall be sent to any other secured party from whom the secured party has received (before sending his notification to the debtor or before renunciation by the debtor of his rights) written notice of a claim of an interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale.

■ As a threshold matter under § 9504(c) then, the secured creditor *must:* (1) give reasonable notice of the sale of the collateral to the debtor; and (2) act in a commercially reasonable manner in disposing of the collateral. The questions of what constitutes proper notice and commercial reasonableness are often posed and, although there are no hard and fast rules, certain basic principles apply. For one, it is well-recognized that the purpose underlying the requirement that the debtor receive notice of the disposition of the collateral is not merely to advise him of the termination of his title and his redemption rights but also to protect him from the unfair imposition of a deficiency claim by allowing him to attend or bring other potential buyers to the sale thereby preventing a disposition of the collateral for less than its fair market value. *In re Koresko,* 91 B.R. 689, 698 (Bankr.E.D.Pa.1988).

■ Second, the Pennsylvania Uniform Commercial Code provides that a person has notice and/or notification of a fact when: (1) he has actual knowledge of it; (2) he has received a notice or notification of it; or (3) from all the facts and circumstances known to him at the time in question, he has reason to know that it exists. Stated otherwise, a person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in the ordinary course whether or not such other actually comes to know of it. A person "receives" a notice or notification when (1) it comes to his attention; or (2) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications. *Reuter v. Citizens & Northern Bank,* 410 Pa.Super. 199, 599 A.2d 673, 678 (1991); 13 Pa.C.S.A. § 1201. Hence, while oral notice or notice by word of mouth has been held patently insufficient, where the record contains a mail receipt evincing that written notice was sent by mail to the debtor's office address, reasonable notification will be found to have been given. *In re Koresko, supra; Continental Bank v. Schaler,* 362 Pa.Super. 610, 525 A.2d 388, 390–391 (1987).

■ Finally, it should be noted that under Pennsylvania law, a "guarantor" of a debt is a "debtor" within the meaning of Division 9 of the Uniform Commercial Code. As such, when collateral is to be sold, a guarantor is entitled to the same notice pursuant to Section 9504(c) as is the debtor. *Reuter v. Citizens & Northern Bank, supra,* 599 A.2d at 677, citing *Ford Motor Credit Co. v. Lototsky,* 549 F.Supp. 996, 1003 (E.D.Pa.1982). *See Also: Central W. Rental Co. v. Horizon Leasing,* 967 F.2d 832, 839 (3rd Cir.1992).

■ The issue of commercial reasonableness is somewhat more problematic and, to a large extent, more frequently resolved on a case by case basis. Although it has been said that when a creditor decides to liquidate a debtor's assets, it must act as the debtor's fiduciary and make a sincere effort to obtain the full market value for the property, the fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. *U.S.A. on Behalf of Small Business Administration v. Chatlin's Department Store, Inc.,* 506 F.Supp. 108, 111 (E.D.Pa.1980); *United States on Behalf of Small Business Administration v. Gore, supra,* at 347; 13 Pa.C.S.A. § 9507(b). Moreover, while it is up to the creditor to rebut the presumption that the

value of the collateral equalled the indebtedness secured once the issue of commercial reasonableness has been raised, under Section 9507(b) of the Code, "if the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at a price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner." *See Also: Chatlin's*, and *Gore*, both *Id.* Additional factors such as the setting of an evaluation figure without an independent appraisal, any disparity between price received at an auction and the estimated value of the assets, and the good faith, avoidance of loss and effective realization of the seller/secured party are all relevant in considering the commercial reasonableness of the sale of collateral. *In re Auer v. Equibank*, 103 B.R. 700, 703 (Bankr. W.D.Pa.1989); *Chatlin's, supra* at 112; *Reuter, supra*, 599 A.2d at 680.

Viewing this case in light of the foregoing standards, we initially note that the Security Agreement and Master Credit Agreement at issue here defines default as occurring upon, *inter alia*, the debtor's "fail[ure] to make any payment to Secured Party ... when and as due in accordance with the terms of this Agreement ...," the filing of "a tax lien or notice thereof against any of the debtor's property," or the institution of "a proceeding in bankruptcy, insolvency or receivership by or against [the debtor or his property," or the making of "an assignment ... by [the] debtor for the benefit of creditors ..." Paragraph 6.0(a) and (b). The said Security Agreement further states:

that "upon the occurrence of an event of default, Secured Party may take immediate possession of said vehicles [i.e., B.J.M.'s inventory] without demand or further notice and without legal process; and for the purpose and furtherance thereof, Debtor shall if Secured Party so requests, assemble the vehicles and make them available to Secured Party at a reasonably convenient place designated by Secured Party and Secured Party shall have the right and Debtor hereby authorizes and empowers Secured Party to enter upon the premises wherever said vehicles may be, to remove same. In addition, Secured Party or its assigns shall have all the rights and remedies applicable under the Uniform Commercial Code or under any other statute or at common law or in equity or under this Agreement. Such rights and remedies shall be cumulative. Debtor hereby agrees that it shall pay all expenses and reimburse Secured Party for any expenditures, including reasonable attorney's fees and legal expenses, in connection with Secured Party's exercise of any of its rights and remedies under this Agreement."

It is therefore obvious from the language of the foregoing paragraph that B.J.M., Jr., Inc.'s failure to promptly pay Chrysler Credit Corporation the principal and interest due upon the sale of a floor-planned, financed vehicle thereby resulting in a "sold-out-of-trust" condition constituted a default under the Security and Master Credit Agreement (Exhibit P–13) and was sufficient to trigger Chrysler Credit's available remedies under the Pennsylvania Uniform Commercial Code. On November 8, 1991, Chrysler Credit Corporation orally declared B.J.M. to be in default of the Security and Master Credit Agreement.

In this case, Chrysler Credit Corporation elected the remedy available to it under 13 Pa.C.S.A. §§ 9503 and 9504 and paragraph 6.0 of the Security Agreement—it took possession of the collateral, disposed of it and applied the proceeds toward repayment of B.J.M., Jr., Inc.'s debt to it. The record evidence in this matter clearly reflects that while Chrysler Credit sent written notice on April 3, 1992 to B.J.M., Jr., Inc., the Gambones, Harveys and Lashingers of the April 11, 1992 auction of the dealership's furniture, equipment, fixtures, etc., it did not give any notice whatsoever of the auction dates for the dealership's motor vehicle inventory to the B.J.M. parties. As a consequence, this Court must conclude that Chrysler Credit failed to comply with the notice requirements of 13 Pa.C.S.A. § 9504(c) with respect to the sale of the motor vehicle inventory.

■ Turning next to the issue of commercial reasonableness first as to the sale of

the inventory and then as to the sale of the fixtures, furniture and equipment, we observe that conflicting expert testimony was presented by the parties on the reasonableness of the sale of the inventory. Justin Gambone, testifying as an expert witness on behalf of the B.J.M. parties, opined that the vehicles were not sold in a manner which was commercially reasonable inasmuch as they were sold off-site at a Chrysler-controlled, dealers-only auction at wholesale prices. According to Mr. Gambone, the best way to dispose of the dealership's inventory would have been to sell the vehicles on the dealership's premises at retail to the general public. Alternatively, the vehicles could have been sold on-site at an open auction. Either of these sales methods, in Mr. Gambone's opinion, would have resulted in a higher recovery on B.J.M.'s inventory. (N.T. 6/09/93, 6-9) Mr. Gambone, however, did not testify that the inventory (which was sold at an area auto auction) was sold in a fashion that was contrary to the usual manner of disposition in an unusual market or to parties who did not deal in the type of property sold nor did he testify as to how much more Chrysler Credit could have realized on the sale of the inventory had the vehicles been sold in the manner which he had advocated.

For its part, Chrysler Credit Corporation presented the expert testimony of Lawrence Bideau, who has been employed as one of its marketing specialists for the past seven years. Although, Mr. Bideau essentially agreed with Mr. Gambone's testimony that a better method of disposition would be to auction off-site to the general public, in his experience, Chrysler Credit has always sold repossessed vehicles at dealer-auctions and they usually get more for the vehicles when they sell at a Chrysler-dealers only auction. In this case, Mr. Bideau further testified, Chrysler Credit Corporation sold B.J.M.'s used car inventory (i.e. all of those vehicles which the factory would not buy back) for some 110% of average book value. (N.T. 6/09/93, 153-164) It was therefore Mr. Bideau's opinion that the sale of B.J.M., Jr., Inc.'s motor vehicle inventory was commercially reasonable.

In reconciling these testimonial conflicts between what are clearly two interested witnesses, we nevertheless find that the auctions of the vehicles did fall within the confines of commercial reasonableness. Indeed, while it is true that Chrysler Credit could have selected an alternative method of sale, there is simply no evidence that the dealers-only auction method utilized did not conform to reasonable commercial practices in the auto dealership industry nor is there any evidence to suggest that a more favorable result than 110% of average book value could have been attained had another method of sale been employed. *See Also:* Exhibit P-20. We therefore conclude that Chrysler Credit Corporation's disposition of BJM/All-Star's inventory complied with the requirements of 13 Pa.C.S.A. § 9504(c).

 Turning to the disposition of the dealership's equipment, fixtures and furniture, the record evidence indicates that those items were sold as part of an open, public equipment auction on Saturday, April 11, 1992, and that that auction was advertised by the auction company through a national publication and the posting of sales flyers. There was further testimony that some 2,000 people were in attendance at that auction and that it netted a total of $13,050.01 after expenses which was paid directly to Chrysler Credit and applied toward B.J.M.'s debt. (N.T. 6/03/93, 39-41; 6/07/93, 25-26,, 56-59; Exhibit P-21) While both Mr. Gambone and Mr. Lashinger testified that Chrysler Credit seized from the dealership's offices a marble desk, credenza and bookshelf that in their estimation were worth $50,000, there was no evidence that these items had been independently appraised. Moreover, according to Jay and Luke Whitman of the Omar Landis Auction Company, these items were severely worn and battered and were unlikely worth that $50,000 figure. (N.T. 6/07/93, 38, 47-48; 6/09/93, 45-46) There was likewise no evidence produced with respect to the value of any of the other items auctioned (with the exception of the telephone and computer systems) nor did either party produce anything to suggest that the property could have been disposed of differently or with a more favorable result. Accordingly, we hold that the sale was on the whole commercially reason-

able and that the plaintiff credit company acted with relative honesty and good faith in the sale of the collateral.

Insofar as the telephone and computer systems are concerned, the record evidence reveals that the phone system was leased from Century Equipment Company, that as of December 31, 1991, it was valued at $15,185.92 and that the computer equipment was leased through First People's Bank of New Jersey and that the balance due under that lease as of the same date was $31,914.34. The record further reflects that the phone system and the computers were sold at auction for a combined total of $125. In light of the foregoing evidence then, while this Court finds that the sale of B.J.M.'s furniture, fixtures and equipment other than the phone and computer systems was commercially reasonable, we cannot find that Chrysler Credit has met its burden of proof with respect to the sale of the telephone and computer systems. We therefore find that Chrysler Credit failed to comply with 13 Pa.C.S.A. § 9504(c) as to the sale of these items.

D. *Remedies Available to B.J.M. Parties for Chrysler Credit Corporation's Failure to Comply with 13 Pa.C.S.A. § 9504(c)*

It is firmly established that under 13 Pa. C.S.A. §§ 9506 and 9507, the debtor, too, has certain rights. Under Section 9506,[10] he has the right to redeem the collateral and it has been said that it is because of this right of redemption that the secured party must give him notice of any intended sale or other disposition of the collateral. *See, e.g.: Skeels v. Universal C.I.T. Credit Corp.*, 222 F.Supp. 696, 702 (W.D.Pa.1963), vacated on other grounds, 335 F.2d 846 (3rd Cir.1964). Under § 9507(a), the debtor has the right of recovery against the secured party for the secured party's failure to comply with the require-

ments of the Uniform Commercial Code. Specifically, section 9507(a) provides:

If it is established that the secured party is not proceeding in accordance with the provisions of this chapter disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this chapter. If the collateral is consumer goods, the debtor has a right to recover in any event an amount not less than the credit service charge plus 10% of the principal amount of the debt or the time price differential plus 10% of the cash price.

Notwithstanding § 9507(a)'s allowance of recovery for "any loss caused by a failure to comply ...," there is no clear definition of "loss" or any clear measure of damages under either the Code or existing caselaw. Rather, there appear to be two major irreconcilable lines of authority on the issue, with neither the Third Circuit Court of Appeals nor the Pennsylvania Supreme Court having ever addressed the issue or adopted either line of reasoning. Not surprisingly, the B.J.M. parties urge this Court to follow the position taken by the court in *Skeels v. Universal C.I.T. Credit Corp., supra* and the cases that follow it. Ironically, that case is strikingly similar to the instant matter in that the plaintiff Chrysler dealer's entire inventory was summarily repossessed and sold without notice for a sold-out-of-trust condition. In disposing of the defendant credit company's post-trial motions, the district court observed that there was no case under Pennsylvania law in which a security holder

---

**10.** That section states:

At any time before the secured party has disposed of collateral or entered into a contract for its disposition under section 9504 (relating to right of secured party to dispose of collateral after default) or before the obligation has been discharged under section 9505(b) (relating to acceptance of collateral as discharge of obligation) the debtor or any other secured party may unless otherwise agreed in writing

after default redeem the collateral by tendering fulfillment of all obligations secured by the collateral as well as the expenses reasonably incurred by the secured party in retaking, holding and preparing the collateral for disposition, in arranging for the sale, and to the extent provided in the agreement and not prohibited by law, his reasonable attorneys' fees and legal expenses.

had been denied recovery for a so-called loss when notice had not been given. *Id.* at 702, citing *Atlas Credit Corporation v. Dolbow*, 193 Pa.Super. 649, 165 A.2d 704 (1960) and *Alliance Discount Corporation v. Shaw*, 195 Pa.Super. 601, 171 A.2d 548 (1961). Nevertheless, the *Skeels* court held:

> "It seems to this court, however, that to permit recovery by the security holder of a loss in disposing of the collateral when no notice has been given, permits a continuation of the evil which the Commercial Code sought to correct. The owner should have an opportunity to bid at the sale … A security holder who disposes of collateral without notice denies to the debtor his right of redemption which is provided him in Section 9–506. In my view, it must be held that a security holder who sells without notice may not look to the debtor for any loss."

*See Also: United States v. Dawson*, 929 F.2d 1336 (8th Cir.1991) (construing Arkansas law); *In re Kirkland*, 915 F.2d 1236 (9th Cir.1990) (construing California law); *Atlas Thrift Company v. Horan*, 27 Cal.App.3d 999, 104 Cal.Rptr. 315 (1972).

In contrast, a number of other courts have held that in those situations where the creditor has failed to give the requisite notice, the appropriate remedy is to impose on the creditor the burden of proving the market value of the collateral as a pre-requisite to the recovery of any deficiency judgment. *Rushton v. Shea*, 423 F.Supp. 468, 470 (D.Del. 1976). Thus, where the secured party can prove that the sale resulted in the fair and reasonable value of the security being credited to the debtor's account, a deficiency judgment may be pursued. *Citi–Lease Co. v. Entertainment Family Style Co.*, 825 F.2d 1497, 1501 (11th Cir.1987) applying New Jersey law and citing *Conti Causeway Ford v. Jarossy*, 114 N.J.Super. 382, 276 A.2d 402, 404–405 (Law Div.1971), aff'd, 118 N.J.Super. 521, 288 A.2d 872 (App.Div.1972). *See Also: Northwest Acceptance Corp. v. Lynnwood Equipment, Inc.*, 841 F.2d 918 (9th Cir.1988) (applying Washington law); *Matter of Excello Press, Inc.*, 890 F.2d 896 (7th Cir.1989), (applying New York law).

■■■ Regardless of the absence of binding precedent, we must still resolve the issue of whether Chrysler Credit's failure to notify the debtors in this case should foreclose it from obtaining a judgment in its favor for the difference between the amount owed to it and the amount realized upon sale of the inventory. In so doing, we are guided both by Judge Willson's observation in *Skeels* that there has been no case in Pennsylvania wherein a security holder has been denied recovery for a loss on the collateral when notice has not been given and by the observation of the Pennsylvania Superior Court in *Beneficial Consumer Discount Co. v. Savoy*, 291 Pa.Super. 649, 436 A.2d 687, 689 (1981) that no Pennsylvania court has even held that a commercially unreasonable resale bars entirely any deficiency judgment. We therefore find that the better-reasoned and more equitable approach is to place upon Chrysler Credit the burden of proving the market value of the collateral and the commercial reasonableness of the sale before assessing whether or not it is entitled to a judgment in its favor for a deficiency.

So saying, we must next evaluate the sufficiency of Chrysler Credit's proofs in that regard. As was previously discussed in Section C above, it is this Court's considered opinion that Chrysler has failed to show that the sale of B.J.M.'s leased telephone and computer systems was commercially reasonable or that the value of those items differed from the amounts due under the leases. We further concluded as the result of the discussion outlined in Section C, that the sale of the motor vehicle inventory was commercially reasonable. Based upon the testimony of Mr. Gambone, Mr. Bideau and Mr. Tallant, we now additionally find that Chrysler Credit has met its burden of proving that it received fair market value for the vehicles auctioned. (N.T. 6/03/93, 33, 35–37; 6/09/93, 7–9, 153–156; Exhibit P–20) [11] In light of all of the

---

11. What's more, by Mr. Gambone's and Mr. Lashinger's own admissions, they were well aware that Chrysler intended to dispose of the dealership's inventory inasmuch as they were present at the hearing before Judge Scholl on March 18, 1992. Mr. Gambone was present when representatives of Chrysler Credit Corporation and Hatfield Auto Auction took possession of

foregoing then, we believe that Chrysler is entitled to a deficiency judgment in its favor calculated in the following manner:

Principal Amount of Debt

| | | |
|---|---|---|
| (S.O.T./Shortfall on Sale of Inventory) | | $665,578.12 |
| Credits: | Sale of Franchise | $323,877.50 |
| | Sale of Furniture, Equipment, etc. | 60,025.27 |
| | Parts Return Credit | 68,552.76 |
| | Subtotal: | $213,122.59 |
| Payment of IRS Lien | | 80,000.00 |
| | Total Due and Owing: | $293,122.59 |

## II. THE COUNTERCLAIMS OF THE B.J.M. PARTIES

### A. Standing to Sue

For their part, Joseph Lashinger, Justin and Carol Gambone and B.J.M., Jr., Inc. have counterclaimed and seek damages from Chrysler Credit and its agents and employees for, inter alia, lender liability and bad faith, trespass, unlawful seizure and conversion of assets and fraud and misrepresentation. In response thereto, Chrysler Credit Corporation preliminarily asserts that those claims must be dismissed due to the application of the automatic stay provisions of the Bankruptcy Code, 11 U.S.C. § 362 and the fact that Mr. Lashinger and the Gambones lack the capacity or standing to pursue these claims on behalf of the bankrupt corporation.

■ It is axiomatic that a stockholder, director, officer or employee of a corporation has no individual right of action against third persons for damages that result indirectly to the individual because of an injury to the corporation. Temp–Way Corporation v. Continental Bank, 139 B.R. 299, 316–317 (E.D.Pa.1992), aff'd, 981 F.2d 1248 (3rd Cir. 1992); Nagle v. Commercial Credit Business Loans, Inc., 102 F.R.D. 27, 29 (E.D.Pa.1983). Although the Third Circuit has yet to specifically so hold, it is also generally accepted that guarantors of a corporation's debt, even if those guarantors are also stockholders, do not have standing to bring an action if the only harm suffered is derivative of the harm the corporation suffered. Temp–Way, supra, citing, inter alia, Mid–State Fertilizer v. Exchange National Bank, 877 F.2d 1333, 1335–37 (7th Cir.1989); Sparling v. Hoffman Construction Co., Inc., 864 F.2d 635, 641 (9th Cir.1988).

■ These general principles, however, are not without certain exceptions. One such exception exists where there is a special duty such as a contractual duty or fiduciary relationship between the wrongdoer and the shareholder.[12] Bohm v. Commerce Union Bank of Tennessee, 794 F.Supp. 158, 161 (W.D.Pa.1992); Cole v. Ford Motor Co., 566 F.Supp. 558, 569 (W.D.Pa.1983). Similarly, an individual shareholder or officer may

the motor vehicle inventory and they both voluntarily surrendered their and their wives' demonstrator vehicles to Chrysler Credit. (N.T. 6/04/93, 99–101; 6/08/93, 99–101; 6/08/93, 88–90; 6/09/93, 60–62) It is therefore obvious that the debtors were simply unable to redeem the collateral even had they received proper notice of each of the auctions.

12. A fiduciary or confidential relationship will be said to arise when confidence is reposed by persons in the integrity of others and if that confidence is voluntarily accepted or assumed by those others, they cannot act so as to take advantage of the reposing parties' interests without their knowledge or consent. See: Maritrans v. Pepper, Hamilton & Scheetz, 529 Pa. 241, 602 A.2d 1277, 1283, n. 3 (1992).

bring an action directly against a third party where he has pled an injury separate and distinct from that incurred by the corporation. *eds Adjusters, Inc. v. Computer Sciences, Corp.*, 818 F.Supp. 120, 121 (E.D.Pa. 1993).

In this case, neither B.J.M., Jr., Inc., Mr. Lashinger nor the Gambones pleaded the existence of a contractual duty or fiduciary relationship between themselves and the Chrysler parties and standing thus cannot be premised on the basis of the first enumerated exception. What's more, since the counterclaims of B.J.M., Jr., Inc., Mr. Lashinger and the Gambones essentially mirror one another, this Court is hard pressed to find that Mr. and Mrs. Gambone and Mr. Lashinger have succeeded in pleading an injury and in raising counterclaims which are separate and distinct from those of the corporation. Accordingly, we can make no other finding but that Mr. Lashinger and Mr. and Mrs. Gambone cannot in their own right pursue the claims which they have asserted in Counts I–IX of their Counterclaim.[13]

This finding notwithstanding, this Court nevertheless sees no reason why the counterclaims for lender liability, bad faith, etc. of B.J.M., Jr., Inc. could not have been heard. In this regard, the holding of the Third Circuit Court of Appeals in *Maritime Electric Co., Inc. v. United Jersey Bank*, 959 F.2d 1194 (3rd Cir.1991) is clear and unambiguous:

"Although the scope of the automatic stay is broad, the clear language of section 362(a) indicates that it stays only proceedings *against* a "debtor"—the term used by the statute itself. The statute does not address actions brought *by* the debtor which would inure to the benefit of the bankruptcy estate ... Thus, within one case, actions *against* a debtor will be suspended even though closely related claims asserted *by* the debtor may continue. Judicial proceedings resting on counterclaims and third-party claims asserted by a defendant-debtor are not stayed, while same-case proceedings arising out [of] claims

asserted by the plaintiff are stayed." 959 F.2d at 1204–1205 citing *In re Berry Estates*, 812 F.2d 67, 71, (2nd Cir.), *cert. denied*, 484 U.S. 819, 108 S.Ct. 77, 98 L.Ed.2d 40 (1987); *Assoc. of St. Croix Condominium Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3rd Cir.1982); *First Wisconsin National Bank v. Grandlich Development Corp.*, 565 F.2d 879, 880 (5th Cir.1978). (emphasis in original.)

Instantly, the record reflects that in January, 1992, B.J.M., Jr., Inc. filed for protection under Chapter 11 of the Bankruptcy Code and that on March 6, 1992, Judge Bechtle (to whom this case was then assigned) ordered that Plaintiff's motion for an expanded writ of seizure against B.J.M., Jr., Inc. only be stayed pending the outcome of the bankruptcy proceeding. Judge Bechtle's order further provided that "all other parties, claims and defenses are not stayed by this order but shall proceed." To date, that order has not been vacated or modified in any manner nor has any party requested that any alteration be made thereto. We thus now revisit Chrysler Credit's contention that Messrs. Lashinger, DeVito and Morganstern should be foreclosed from representing the corporation at trial because of an inherent conflict of interest and because they were never formally approved by the Bankruptcy Court.

It is of course indisputable that any causes of action which accrue to a debtor who has filed for relief under the Bankruptcy Act before the filing of the bankruptcy petition become the property of the bankruptcy estate and may thereafter be prosecuted only by the trustee or a duly appointed representative of the estate. *Committee of Unsecured Creditors of Specialty Plastic v. Doemling*, 127 B.R. 945 (W.D.Pa.1991); *Lambert v. Fuller Company, Inc.*, 122 B.R. 243 (E.D.Pa.1990); 11 U.S.C. § 541. It is equally well-settled that "the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers or other professional persons that do not hold or represent an interest adverse to

13. In view of this conclusion, we see no need to address Chrysler Credit's argument that Mr. Lashinger and Mr. and Mrs. Gambone effectively released any claims that they may have had against it at the time of the refinancing.

the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties ..." 11 U.S.C. § 327(a). "Disinterested person," in turn, is defined at 11 U.S.C. § 101(14) as meaning a person who:

(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not an investment banker for any outstanding security of the debtor;

(C) has not been, within three years before the date of the filing of the petition, an investment banker for a security of the debtor, or an attorney for such an investment banker in connection with the offer, sale, or issuance of a security of the debtor;

(D) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor or of an investment banker specified in subparagraph (b) or (c) of this paragraph; and

(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (b) or (c) of this paragraph, or for any other reason.

Historically, bankruptcy courts have been accorded wide discretion in connection with fact-intensive matters and in regard to the terms and conditions of the engagement of professionals. Each situation, however, must be judged prospectively on its own merits. *In re Martin,* 817 F.2d 175, 182, 183 (1st Cir.1987). Such a flexible approach requires the courts to analyze the factors present in any given case in order to determine whether the efficiency and economy which may favor multiple representation must yield to competing concerns affecting fairness to all parties involved and protection of the integrity of the bankruptcy process. Factors to be considered include, but are not limited to, the nature of disclosure of the conflict made at the time of appointment, whether the interests of the related estates are parallel or conflicting and the nature of the interdebtor

claims made. *In re BH & P, Inc.,* 949 F.2d 1300, 1316 (3rd Cir.1991).

Finally, the law is further clear that bankruptcy courts may in extraordinary circumstances and under their broad equity power grant retroactive approval of the employment of counsel and other professionals. *Matter of Arkansas Co., Inc.,* 798 F.2d 645, 648 (3rd Cir.1986). In such circumstances, the courts have authorized the utilization of a two-part test to determine the propriety of such retroactive approval: first, the court must find that the applicant/professional satisfies the disinterestedness requirements of section 327(a) and would therefore have been appointed initially; and second, the court must, in the exercise of its discretion, determine that the particular circumstances presented are so extraordinary as to warrant retroactive approval. *F/S Airlease II, Inc. v. Simon,* 844 F.2d 99, 105 (3rd Cir.1988); *Arkansas,* at 650. To guide the courts in the exercise of their discretion regarding the existence of extraordinary circumstances, such factors as the following are appropriately considered: whether the applicant or some other person bore responsibility for applying for approval; whether the applicant was under time pressure to begin service without approval; the amount of delay after the applicant learned that initial approval had not been granted, and the extent to which compensation to the applicant will prejudice innocent third parties. *F/S Airlease* at 105–106; *Arkansas,* at 650.

In this case, Chrysler Credit contends that this Court should also decline to consider B.J.M., Jr., Inc.'s counterclaims because: (1) the trustee was not permitted to make any statements at trial, (2) the Bankruptcy Court never formally approved the appointments of Messrs. Lashinger, DeVito and Morganstern as counsel for the bankrupt corporation, and (3) because of their respective positions as guarantor and counsel for the guarantors, Messrs. Lashinger, DeVito and Morganstern have a conflict of interest with B.J.M., Jr., Inc.

Addressing each of these arguments *seriatim,* we note that while it is true that the B.J.M. trustee was not permitted to argue on

behalf of the corporation at trial, that ruling was premised not upon the presentation of the counterclaims, but rather upon the fact that there was no need for the corporation to present a defense to Chrysler Credit's claims against it due to the bankruptcy stay and this Court in no way intended to preclude the trustee from addressing the court with respect to the counterclaims.

Second, as the copy of the transcript from the December 2, 1992 hearing[14] before Bankruptcy Judge Scholl reflects, the question of whether Mr. Lashinger should be appointed to represent the bankruptcy estate and whether he and his counsel had such a conflict of interest was argued and discussed at length, albeit in the context of a confirmation hearing. Although Judge Scholl did not issue a formal ruling on the issue apparently because the matter was converted to a Chapter 7 liquidation, the record from that proceeding clearly suggests that Judge Scholl could not find that any conflict of interest existed. Having thoroughly reviewed the record of this proceeding and the bankruptcy hearing and in light of the fact that this Court has jurisdiction to hear appeals from decisions and judgments rendered by the bankruptcy courts (*See:* 28 U.S.C. § 158), we too can find no inherent conflict of interest between Lashinger, Gambone and B.J.M., Jr., Inc. nor has Chrysler Credit Corporation been able to show that the disputed representation would present a conflict within the meaning of 11 U.S.C. § 101(14). To the contrary, insofar as the recovery of as much money as possible for the bankruptcy estate is in the best interests of all concerned, particularly the guarantors, we conclude that, if anything, these three parties share a common goal and a parallel interest. We thus see no reason why Mr. Lashinger, Mr. DeVito and Mr. Morganstern should be precluded from representing and assisting B.J.M., Jr., Inc.'s bankruptcy trustee in the prosecution of its counterclaims against Chrysler Credit.

Moreover, we additionally believe that the interests of all parties and judicial economy would best be served by granting retroactive approval to the appointment of Lashinger, DeVito and Morganstern as counsel for the trustee. To be sure, assuming that the estate had the resources to pursue its counterclaims at a later time, it is obvious that a second trial would have to be held at which the evidence presented would be undoubtedly identical to that already presented to this Court. To require that additional counsel and witness fees be paid and additional judicial time be expended, would be, in the opinion of this Court, an unnecessary waste of resources. So saying, we hereby find that sufficient extraordinary circumstances exist to justify retroactive approval of the trustee's appointment of Lashinger, DeVito and Morganstern as counsel for the corporation.

### B. *B.J.M., Jr., Inc.'s Counterclaim for Lender Liability*

By way of its counterclaim, B.J.M., Jr., Inc. first asserts that the counterclaim defendants violated their duty to act in good faith in that they allegedly prematurely declared the dealership to be in default, in managing the credit program in such a way as to injure B.J.M.'s business and in permitting the dealership to be undercapitalized in the May, 1991 restructuring. As a result, B.J.M., Jr., Inc. argues that Chrysler Credit, its agents and employees should be held liable to it for the damages it suffered as the result of Chrysler Credit Corporation's shutdown of its business.

The courts of Pennsylvania, however, have recognized a separate, common-law duty of good faith performance of contracts only in limited situations where there is some special relationship between the parties, such as a confidential or fiduciary relationship. It should be noted that where a good faith duty has been found to exist, it arises under the law of contracts, not under the law of torts. *Creeger Brick and Building Supply Inc. v. Mid–State Bank and Trust Co.*, 385 Pa.Super. 30, 560 A.2d 151 (1989); *Commonwealth, Department of*

---

**14.** A copy of this transcript was attached to the Trustee's Supplemental Post–Trial Brief and, as Chrysler Credit states in its Letter Brief in response thereto, it has no objection to the transcript itself being made an exhibit.

*Transportation v. E–Z Parks,* 153 Pa. Cmwlth. 258, 620 A.2d 712, 717 (1993). A confidential or fiduciary relationship exists when "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an over-mastering dominance on one side, or weakness, dependence or justifiable trust, on the other. A business association may be the basis of a confidential relationship only if one party surrenders substantial control over some portion of his affairs to the other. *Id.,* citing *Estate of Clark,* 467 Pa. 628, 635, 359 A.2d 777, 781 (1976) and *In re Estate of Scott,* 455 Pa. 429, 433, 316 A.2d 883, 886 (1974).

Although Pennsylvania law has recognized the duty of good faith in such relationships as franchisor-franchisee and insurer-insured, to date the Pennsylvania Supreme Court has refused to recognize an implied contractual duty of good faith in the lender/borrower relationship or to impose a duty of good faith which would modify or defeat the legal rights of a creditor. *Creeger Brick, supra,* 560 A.2d at 154 citing *Heights v. Citizens National Bank,* 463 Pa. 48, 342 A.2d 738 (1975). In this regard, several courts have stated:

> ". . . a lending institution does not violate a separate duty of good faith by adhering to its agreement with the borrower or by enforcing its legal and contractual rights as a creditor. The duty of good faith imposed upon contracting parties does not compel a lender to surrender rights which it has been given under the terms of its contract. A lender has not violated a duty of good faith merely because it has negotiated loan terms which are favorable to itself. As such, a lender generally is not liable for harm caused to a borrower by refusing to advance additional funds, release collateral or assist in obtaining additional loans from third persons."

*Bohm v. Commerce Union Bank of Tennessee, supra,* at 163; *Temp–Way Corporation v. Continental Bank, supra,* at 320, both citing *Creeger* at 154. *See Also: AAMCO Transmissions, Inc. v. Harris,* 759 F.Supp. 1141, 1147, n. 11 (E.D.Pa.1991). As previously noted, a good faith performance or enforcement under the Pennsylvania Uniform

Commercial Code is said to be "honesty in fact in the conduct or transaction concerned." *Lichtenstein v. Kidder, Peabody, supra.*

 In the case at bar, B.J.M., Jr., Inc. has not shown that it had reposed a special confidence or trust in Chrysler Credit Corporation or that there was some type of fiduciary relationship between the two parties such as would give rise to a duty of good faith. There has likewise been no showing that Chrysler Credit Corporation acted dishonestly in its dealings with B.J.M. so as to violate its obligations under 13 Pa.C.S.A. 1203. On the contrary, all of the record evidence evinces that the parties had a strict business relationship and that all of their agreements were the result of equal, arms-length bargaining negotiated by two relatively experienced, intelligent and professional businessmen, Mr. Lashinger and Mr. Gambone, one of whom is an attorney-at-law and the other an accountant. The record additionally indicates that in declaring B.J.M. to be in default upon discovering in November, 1991 that it was sold-out-of-trust in the approximate amount of $65,000 and in obtaining an injunction preventing the dealership from disposing of additional vehicles, Chrysler Credit was merely enforcing the rights and remedies available to it under, among other clauses, paragraph 6.0 of the Security and Master Credit Agreement.

Likewise, while there was both documentary and testimonial evidence that Chrysler Credit Corporation had drafting rights on B.J.M.'s checking account and had lodged an assignment in its favor of all factory receivables, these rights too, as well as the Gambone and Lashinger's forgiveness of the loans which they had made to the corporation, were knowingly negotiated and agreed to by B.J.M.'s principals. This Court therefore cannot find that B.J.M., Jr., Inc. has made out a claim for lender liability/breach of the duty of good faith dealing against Chrysler Credit and judgment in favor of the counterclaim defendant must be entered in no amount on counts I, II and III of the counterclaim.

### C. *B.J.M., Jr., Inc.'s Claim for Tortious Interference*

B.J.M. next avers that Chrysler Credit Corporation through its authorized employee,

George Tallant, is liable to it for the malicious/tortious interference with its business relationships with Madison Bank and in its attempts to sell its franchise.

■ Interference with a prospective business or contractual relation is a tort long recognized by the Courts of the Commonwealth of Pennsylvania. *Vintage Homes, Inc. v. Levin,* 382 Pa.Super. 146, 554 A.2d 989, 994 (1989) allocatur denied, 524 Pa. 622, 571 A.2d 384 (1990) citing *Thompson Coal Company v. Pike Coal Co.,* 488 Pa. 198, 412 A.2d 466 (1979); *Commonwealth, Department of Transportation v. Cumberland Construction Co.,* 90 Pa.Cmwlth. 273, 494 A.2d 520, 525 (1985), alloc. den., 513 Pa. 636, 520 A.2d 1386 (1986); *Sachs v. Continental Oil Company,* 454 F.Supp. 614, 620 (E.D.Pa. 1978). To sustain such a cause of action, the following four elements must be shown:

(1) a prospective contractual relation;

(2) the purpose or intent to harm the plaintiff by preventing the relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual damage resulting from the defendant's conduct.

*Vintage Homes, supra,* 554 A.2d at 994.

■ Similarly, the gist of tortious interference with a business relationship is the intent to destroy plaintiff's good will and reputation. Where a defendant's breach of his contract with the plaintiff has only an incidental consequence of affecting plaintiff's business relationships with third persons, an action lies only in contract for defendant's breaches, including any recoverable consequential damages. *DiCesare–Engler Productions, Inc. v. Mainman, Ltd.,* 81 F.R.D. 703, 710 (W.D.Pa.1979) citing *George A. Davis, Inc. v. Camp Trails Co.,* 447 F.Supp. 1304, 1310 (E.D.Pa.1978); *Glazer v. Chandler,* 414 Pa. 304, 200 A.2d 416, 418 (1964).

■ Instantly, Mr. Lashinger, Mr. Gambone and Mr. DeLisi testified that they requested Mr. Tallant to re-deposit the three checks that had "bounced" in early November, 1991 thereby resulting in the sold-out-of-trust condition but that Mr. Tallant refused to do so. Mr. Tallant acknowledged that he declined to re-submit the checks for payment, stating that it was against his company's policy and that several days later, Chrysler Credit Corporation's credit committee declared B.J.M., Jr., Inc. to be in default of its obligations under the Security and Master Credit Agreement. Although it is obvious that this declaration of default undoubtedly harmed the dealership's relationship with Madison Bank because Chrysler Credit's security interests had priority, we do not believe that this "injury" resulted from Chrysler's tortious or malicious interference with B.J.M.'s relationship with the bank. Indeed, it has been held that the mere unilateral refusal to deal with another in a business matter is not tortious. *See: A–1 Credit and Assurance Company, Inc. v. Trans Union Credit Information Co.,* 678 F.Supp. 1147, 1150 (E.D.Pa.1988).

■ We also cannot find that Chrysler Credit tortiously interfered with the sale of B.J.M.'s Jeep/Eagle franchise. Again, the only evidence with respect to this claim came in the form of testimony from Messrs. Lashinger and Gambone that prior to the May, 1991 restructuring, Mr. Tallant "spoke with" the principal of Norco Jeep/Eagle with whom Lashinger and Gambone were negotiating. Again, after the company had filed for Chapter 11 protection, Chrysler Credit objected through its counsel to the proposed sale of the franchise to Armand Cadillac. (*See, e.g.:* N.T. 6/08/93, 53–55, 84–86). Moreover, even assuming arguendo, that Mr. Tallant interfered, by Mr. Lashinger's own admission, the franchise was eventually sold for only $8,000 less than it may have been sold for to the Armand group. Thus there is evidence of little, if any damages as the result of the alleged interference and no evidence whatsoever that Tallant or Chrysler Credit Corporation purposely or intentionally tried to harm the corporation. For these reasons, judgment must also be entered in favor of the counterclaim defendants in no amount on Counts IV and V of B.J.M.'s Counterclaim.

D. *B.J.M.'s Claims for Unlawful/Unreasonable Seizure and Conversion of Assets*

By way of its original complaint in the now consolidated action, B.J.M., Jr., Inc. addition-

ally seeks to recover from Chrysler Credit Corporation, its agents and employees for the damages which it purportedly sustained as the result of the unlawful entry and seizure of its furniture, fixtures and equipment.

Conversion has been defined as the deprivation of another's right of property in, or use or possession of, a chattel without the owner's consent and without lawful justification. While specific intent is not required, an intent to exercise dominion or control over the goods which is in fact inconsistent with the plaintiff's rights is necessary to establish the tort. Thus conversion can result only from an act intended to affect the chattel. *Project Development Group v. O.H. Materials Corp.*, 766 F.Supp. 1348, 1355 (W.D.Pa.1991); *Shonberger v. Oswell*, 365 Pa.Super. 481, 530 A.2d 112, 114 (1987). When such an act occurs, the plaintiff may bring suit if he or she had either actual or constructive possession or an immediate right to possession of the chattel at the time of the conversion. *Eisenhauer v. Clock Towers Associates*, 399 Pa.Super. 238, 582 A.2d 33, 36 (1990).

Applying these principles to the instant action, we initially observe that B.J.M., Jr., Inc. does not dispute that the assets seized by the defendant credit company and its agents on March 27, 1992 were the subject of numerous and competing security interests of, among others, Century Equipment, Chrysler Credit and Madison Bank. The said corporation also does not dispute that as of April 1, 1992, its tenancy rights to the dealership premises at 2431 West Main Street in Norristown would terminate. Thus, while B.J.M. may have had possession of the articles seized, we cannot find that it has conclusively established that it was any longer the "owner" of the items seized or that the property was taken without the owner's consent.

Moreover, even taking as true B.J.M.'s assertion that the items seized were unlawfully converted, we simply can find no evidence (with the exception of the loss sustained as the result of the commercially unreasonable disposal of the telephone and computer systems as previously discussed) that it suffered any damages as a consequence. Indeed, although Mr. Gambone testified that the "destruction" of B.J.M.'s corporate, service and business records in the course of the assets' seizure adversely affected their efforts to sell the franchise to Armand Cadillac, no evidence was presented as to the degree or the amount of the loss. (*See, e.g.:* N.T. 6/09/93, 25–27) We are thus unable to enter an award in B.J.M.'s favor on its conversion claim either and judgment shall also be entered in favor of the defendants in no amount on the complaint originally filed at 92–4490.[15]

In consideration of all of the foregoing, the following legal conclusions may now be made.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties in the instant case pursuant to 28 U.S.C. § 1332 and the law of Pennsylvania applies.

2. Chrysler Credit Corporation had a valid, enforceable first lien priority security interest in all of B.J.M., Jr., Inc.'s motor vehicle and auto parts inventory, chattel paper, accounts, contract rights, instrument, consumer goods, general intangibles, equipment, furniture, machinery, tools, accessories and supplies.

3. The Security Agreement and Master Credit Agreements between the parties are subject to the provisions of the Pennsylvania Uniform Commercial Code, 13 Pa.C.S.A. § 1101, *et seq.*

4. In failing to promptly pay the proceeds from the sales of the financed/floorplanned vehicles to Chrysler Credit Corporation, B.J.M. breached and defaulted on its obli-

---

**15.** To the extent that the remaining counts of Lashinger and Gambone's amended complaint for estoppel, waiver, detrimental reliance, failure to remit sales taxes and titling fees and failure to join a necessary party belong to the corporation, we note that no evidence was offered to either prove (or disprove) or support any of these assertions. Consequently, there is no need to address them in detail except to enter judgment in favor of Chrysler Credit, Tallant, Dugan and Muscara in no amount with respect to each of these claims.

gations under the Security and Master Credit Agreements.

5. In declaring B.J.M., Jr., Inc. to be in default and repossessing its inventories, accounts, furniture and equipment and in lodging an assignment of its factory receivables with Chrysler Motors Corporation, Chrysler Credit Corporation legally and in good faith exercised the rights and remedies available to it under its Agreements with B.J.M., Jr., Inc. and the Pennsylvania Uniform Commercial Code.

6. The disposal/sale of the dealership's inventories, furniture and equipment was commercially reasonable with the exception of its sale of the computer and telephone systems.

7. Joseph Lashinger, Justin Gambone and Carol Gambone do not have standing in their own right to pursue the claims which they have asserted in Counts I through IX of their counterclaim.

8. The automatic bankruptcy stay of proceedings applies only with respect to Chrysler Credit Corporation's claims against B.J.M., Jr., Inc. The automatic stay does not apply to B.J.M., Jr., Inc.'s claims and counterclaims against Chrysler Credit Corporation, George Tallant and Edward Muscara.

9. Chrysler Credit Corporation is entitled to a deficiency judgment in its favor in the amount of $293,122.59 from Joseph Lashinger and Justin and Carol Gambone as a result of their having personally guaranteed the debts of the now-bankrupt B.J.M., Jr., Inc.

10. B.J.M., Jr., Inc. has failed to establish that it is entitled to either compensatory or punitive damages on any of its claims or counterclaims against Chrysler Credit Corporation, Edward Muscara or George Tallant.

An appropriate order follows.

### ORDER

AND NOW, this 14th day of October, 1993, it is hereby ORDERED that judgment in the amount of $293,122.59 is hereby entered in favor of the Plaintiff Chrysler Credit Corporation and against the Defendants Joseph A. Lashinger, Justin Gambone and Carol J. Gambone jointly and severally on the said Plaintiff's amended complaint.

IT IS FURTHER ORDERED that judgment in no amount is hereby entered in favor of the Defendants/Counterclaim Defendants Chrysler Credit Corporation, George Tallant and Edward Muscara and against the Plaintiffs/Counterclaim Plaintiffs, B.J.M., Jr., Inc., Joseph A. Lashinger and Justin and Carol J. Gambone on all counts of the said Plaintiffs' complaint (originally filed at 92–CV–4490) and counterclaims.